Brent W. Vincent (*pro hac vice*)
brent.vincent@Lathropgpm.com
LATHROP GPM LLP
155 North Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: 312.920.3300
Facsimile: 312.920.3301

Attorney for Defendant/Counterclaim Plaintiff The Roman Catholic Bishop of Orange
*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WESTCHESTER FIRE INSURANCE COMPANY, a Pennsylvania corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE ROMAN CATHOLIC BISHOP OF ORANGE, a California Corporation Sole, and DOES 1 through 50,<br><br>Defendants. | Case No. 8:24-cv-01539-MRA (ADSx)<br><br>**RCBO'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND** |
| THE ROMAN CATHOLIC BISHOP OF ORANGE, a California Corporation Sole,<br><br>Counterclaim Plaintiff,<br><br>vs.<br><br>WESTCHESTER FIRE INSURANCE COMPANY, a Pennsylvania corporation,<br><br>Counterclaim Defendant. | Motion Hearing: November 10, 2025, 1:30 p.m.<br>Hon. Mónica Ramírez Almadani<br>Action filed: July 11, 2024<br>Fact discovery deadline: July 8, 2025<br>Pretrial conference date: TBD<br>Trial date: TBD |

# TABLE OF CONTENTS


**Page**

INTRODUCTION .......... 1

LEGAL STANDARD .......... 2

ARGUMENT .......... 2

I. Section II ("Defense Settlement") Creates a Stand-Alone, Primary Duty to Defend. .......... 2

A. Section II applies whenever an occurrence is covered by umbrella coverage but not covered by underlying insurance. .......... 2

B. Under ordinary duty-to-defend principles, RCBO's burden is minimal. .......... 4

C. RCBO easily satisfies this burden with respect to the CCVA Claims. .......... 5

1. Umbrella coverage extends to intentional acts whereas underlying coverage does not. .......... 6

2. Umbrella coverage encompasses emotional and psychological occurrences that the underlying policies exclude. .......... 8

3. Westchester's own litigation position concedes the gap. .......... 9

D. Westchester's duty to defend extends to all CCVA Claims in which "sexual abuse, harassment and/or assault" potentially happened during the policy period. .......... 9

II. Separately, Section I ("Coverage") Independently Obligates Westchester to Immediately Pay RCBO's Defense Costs. .......... 10

A. Westchester's "ultimate net loss" obligation attaches once RCBO pays an amount equal to "the total of the applicable limits of the underlying policies listed in Schedule A." .......... 11

B. Courts uniformly construe "applicable limits" by Schedule A, not actual coverage. .......... 11

C. RCBO has undisputably satisfied its retained limit burden. .......... 13

D. Once triggered, Section I obligates immediate payment of defense costs. .......... 13

E. Westchester's duty to pay defense costs as "ultimate net loss" extends to all expenses that have not been paid by other insurers. .......... 14

III. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**


*Am. States Ins. Co. v. Ins. Co. of Pa.*,
800 F. App'x 452 (9th Cir. 2020) ........ 4

*Am. States Ins. Co. v. Ins. Co. of Pa.*,
800 Fed. App'x 452 (9th Cir. 2020) ........ 8

*Chatton v. Nat'l Union Fire Ins. Co.*,
10 Cal. App. 4th 846 (1992) ........ 8

*Fibreboard Corp. v. Hartford Accident & Indem. Co.*,
16 Cal. App. 4th 492 (1993) ........ 6

*Fried v. N. River Ins. Co.*,
710 F.2d 1022 (4th Cir. 1983) ........ 12

*Gon v. First State Ins. Co.*,
871 F.2d 863 (9th Cir. 1989) ........ 13

*Hartford Roman Cath. Diocesan Corp. v. Interstate Fire & Cas. Co.*,
905 F.3d 84 (2d Cir. 2018) ........ 7

*Ins. Co. of Pa. v. City of Long Beach*,
342 Fed. App'x 274 (9th Cir. 2009) ........ 7

*Kalama Chem., Inc. v. Allianz Ins. Co.*,
Case No. 90-2-05011-4, 1995 WL 17015061 (Wash. Super. Aug. 14, 1995) ........ 12

*Legacy Vulcan Corp. v. Superior Ct.*,
185 Cal. App. 4th 677 (2010) ........ 2, 3, 4, 5, 10

*Liberty Mut. Ins. Co. v. Ins. Co. of State of Pa.*,
43 A.D.3d 666 (N.Y. App. Div. 2007) ........ 12

*Lowell v. Md. Cas. Co.*,
65 Cal. 2d 298 (1966) ........ 6

*Montgomery Ward & Co., Inc. v. Imperial Cas. & Indem. Co.*, 81 Cal. App. 4th 356 (2000) .......... 14

*NW Pipe Co. v. RLI Ins. Co.*, 734 F. Supp. 2d 1122 (D. Or. 2010) .......... 3, 5

*Powerine Oil Co. v. Superior Ct.*, 37 Cal. 4th 377 (2005), *as modified* (Oct. 26, 2005), *as modified* (Oct. 27, 2005) .......... 3

*Save Mart Supermarkets v. Underwriters at Lloyd's London*, 843 F. Supp. 597 (N.D. Cal. 1994) .......... 7

*Sempra Energy v. Associated Elec. & Gas Ins. Servs. Ltd.*, 772 F. Supp. 3d 1148 (C.D. Cal. 2025) .......... 13, 14

*State Ins. Fund v. Int'l Ins. Co.*, 251 A.D.2d 86 (N.Y. App. Div. 1998) .......... 11, 12

*Truck Ins. Exch. v. Kaiser Cement & Gypsum Corp.*, 16 Cal. 5th 67 (2024) .......... 11

*U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 2006 WL 1663437 at *5 (D. Ariz. June 12, 2006) .......... 14

*U.S. Fire Ins. Co. v. Charter Fin. Grp., Inc.*, 851 F.2d 957 (7th Cir. 1988) .......... 12

*United Pac. Ins. Co. v. McGuire Co.*, 229 Cal. App. 3d 1560 (1991) .......... 7

*W. Protectors Ins. Co. v. Shaffer*, 624 F. Supp. 2d 1292 (W.D. Wash. 2009) .......... 6

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) .......... 2

Defendant/Counterclaimant The Roman Catholic Bishop of Orange ("RCBO") submits this Memorandum in Support of its Motion for Partial Summary Judgment on the duty to defend against Plaintiff/Counter-Defendant Westchester Fire Insurance Company ("Westchester"), as successor in interest to Industrial Underwriters Insurance Company ("Industrial").

## INTRODUCTION

The Motion before the Court is a duty-to-defend dispute. RCBO seeks a ruling that Westchester breached its duty to defend dozens of lawsuits brought against RCBO for "childhood sexual abuse, harassment and/or assault" (the "CCVA Claims") under three commercial umbrella policies issued by Industrial to RCBO effective June 18, 1981 through July 1, 1984 (the "Umbrella Policies").

Westchester attempts to frame this case as a "drop-down" dispute tied to the insolvency of an underlying insurer (Centennial). That is a red herring. Centennial's insolvency has no bearing on Westchester's contractual duty to defend and, separately, Westchester's duty to immediately pay defense costs. Instead, the Umbrella Policies impose that duty independently in two ways:

1. **Primary umbrella coverage under Section II ("Defense Settlement")** — attaches whenever an occurrence is ***potentially*** within the scope of umbrella coverage but outside the scope of underlying insurance. This creates a first-dollar defense obligation not dependent on exhaustion or collectability of underlying insurance.
2. **Excess coverage under Section I ("Coverage")** — obligates Westchester to pay RCBO's "ultimate net loss," including defense costs, once RCBO itself has satisfied its "retained limit" obligation. Per Endorsement 5, RCBO's retained limit is capped at $1.5 million, an amount RCBO has indisputably satisfied in settling prior abuse litigation.

For either reason, Westchester's duty to defend or immediately advance defense costs for the CCVA Claims was triggered. Its refusal to do so constitutes a breach.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Like primary coverage, an umbrella insurer's duty to defend is determined as a matter of law. *See Legacy Vulcan Corp. v. Superior Ct.*, 185 Cal. App. 4th 677, 692-93 (2010).

## ARGUMENT

### I. Section II ("Defense Settlement") Creates a Stand-Alone, Primary Duty to Defend.

#### A. Section II applies whenever an occurrence is covered by umbrella coverage but not covered by underlying insurance.

Section II ("Defense Settlement") of the Umbrella Policies operates as ***primary umbrella coverage***—coverage that is not dependent on the collectability or exhaustion of underlying limits. Accordingly, Centennial's insolvency has no bearing on Westchester's duty to defend the CCVA Claims under Section II ("Defense Settlement").

Section II provides, in pertinent part:

**II DEFENSE SETTLEMENT**

> With respect to any occurrence not covered … by the underlying policies listed in Schedule A hereof or not covered by any other underlying insurance collectible by the insured, but covered by the terms and conditions of this policy except for the amount of retained limit specified in Item 4(C) of the declarations [$10,000], the company shall:
>
> (a) defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; …

> and the amounts so incurred … are payable by the company in addition to the applicable limit of liability of this policy.
>
> ***
>
> The insured shall promptly reimburse the company for any amount of ultimate net loss paid on behalf of the insured within the retained limit specified in Item 4(C) of the declarations [$10,000] except defense settlement costs paid on behalf of the insured within the retained limit.[1]

This language confirms three critical points:

1. **Coverage trigger**: Section II applies whenever one or more occurrence falls within the scope of the umbrella's indemnity coverage but outside the scope of indemnity coverage provided by underlying insurance. *See NW Pipe Co. v. RLI Ins. Co*., 734 F. Supp. 2d 1122, 1129 (D. Or. 2010) (construing identical Section II language; "RLI's policy clearly defines its duty to defend in terms of an occurrence covered by underlying insurance. An occurrence is defined in terms of an event triggering indemnification rather than defense").
2. **First-dollar defense**: Westchester must defend "any suit" meeting that description.
3. **Non-reimbursement of defense costs**: Even within the $10,000 retained limit, Westchester alone bears defense and settlement expenses.

California courts have squarely recognized this structure. *Powerine Oil Co. v. Superior Ct.*, 37 Cal. 4th 377, 398–99 (2005), *as modified* (Oct. 26, 2005), *as modified* (Oct. 27, 2005) ("[T]hese policies also provide umbrella coverage, i.e., alternative primary coverage as to losses 'not covered by' the primary policy. The umbrella coverage here may serve to 'fill any gaps in coverage' left open by the [underlying] coverage....") (internal citations and quotations omitted). Indeed, the

---

[1] *See* RCBO's Statement of Undisputed Material Facts ("SUMF") at ¶ 14 (Umbrella Policies' "**II DEFENSE SETTLEMENT**" coverage).

Court of Appeals in *Legacy Vulcan Corp.*, 185 Cal. App. 4th at 689, 691–92 & n.8, explained that an umbrella policy provides ***primary coverage*** for losses outside the underlying scope, and that the duty to defend under such provisions is immediate—it does not await exhaustion of underlying insurance or any self-insured retention. Federal authority is in accord. *Am. States Ins. Co. v. Ins. Co. of Pa.*, 800 F. App'x 452, 454 (9th Cir. 2020) (umbrella insurer has a first-dollar duty to defend any claim that is covered by umbrella insurance policy but not by the underlying primary insurance).

In short, Section II ("Defense Settlement") creates a stand-alone, primary duty to defend. Once triggered, it obligates Westchester to defend at the outset, even within the retained limit, without any right of reimbursement from RCBO.[2] Centennial's insolvency is therefore immaterial; the umbrella duty attaches by operation of Section II itself.

### B. Under ordinary duty-to-defend principles, RCBO's burden is minimal.

Because Section II constitutes ***primary umbrella coverage***, "the ordinary rules regarding a duty to defend in connection with primary liability coverage apply." *Legacy Vulcan Corp.*, 185 Cal. App. 4th at 692. Those rules are well-settled:

- The duty to defend arises whenever facts alleged in the complaint, or otherwise known to the insurer, ***potentially*** could give rise to coverage under the policy.
- The insured need only show a "possibility" of coverage—not actual coverage.
- The insurer must defend even if the claims are "groundless, false, or fraudulent."

[2] *See* Section II "Defense Settlement" ("The insured shall promptly reimburse the company … ***except defense settlement costs paid on behalf of the insured within the retained limit***.") (emphasis added). SUMF at ¶ 14.

- Any doubt as to the existence of a defense obligation must be resolved in favor of the insured.

*Id.* As the court in *Legacy Vulcan* explained:

> If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim *potentially* covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage.…These principles are fully applicable to the umbrella defense coverage provided by the Transport policy.

*Id.* at 692–93 (emphasis in original).

Applied here, RCBO's burden to secure a defense is minimal. Under the plain language of the Umbrella Policies, Westchester has a duty to defend RCBO when (1) the claim involves "***any*** occurrence" covered by the Umbrella Policies and (2) there is no underlying policy that provides indemnity coverage for that occurrence. *See NW Pipe Co.*, 734 F. Supp. 2d at 1129. As *Legacy Vulcan* confirms, RCBO is not required to prove that the claims are "***actually*** covered" in order to trigger Westchester's defense obligation. The duty attaches so long as there is any ***potential for coverage*** outside the terms of the underlying insurance. *Id.* ("The application of these rules to this case makes it clear that Vulcan need not show that a claim was actually covered by the policy in order to establish a duty to defend with respect to the umbrella coverage. Instead, Transport had a duty to defend under [the primary umbrella coverage clause] if any claim was potentially covered by its policy but was not within the terms of coverage of 'underlying insurance'"). Thus, RCBO need only show that the CCVA Claims allege one or more occurrences that ***potentially*** fall (1) within the scope of umbrella indemnity coverage but (2) outside the scope of underlying indemnity coverage. That is all Section II requires.

**C. RCBO easily satisfies this burden with respect to the CCVA Claims.**

The CCVA Claims satisfy both conditions necessary to trigger Westchester's duty to defend under Section II: they involve "occurrences" that are plainly covered

by the Umbrella Policies while at the same time potentially falling outside the scope of the underlying coverage.

**1. Umbrella coverage extends to intentional acts whereas underlying coverage does not.**

The Umbrella Policies expressly cover "personal injury" arising from "(e) assault and battery not committed by or at the direction of the insured."[3] The CCVA Claims allege precisely that—sexual assaults and batteries perpetrated by clergy members "not committed by or at the direction of" RCBO.[4] California precedent confirms that such allegations presumptively fall within coverage. *See Lowell v. Md. Cas. Co.*, 65 Cal. 2d 298, 301 (1966) (where policy defined assault and battery as a covered accident, "the complaint alleging such conduct at least presumptively indicates coverage under the policy"). Further, the Umbrella Policies' definition of "personal injury" also extends to "(b) invasion of the rights of privacy,"[5] a separate coverage trigger implicated by allegations of grooming, exploitation, and violation of parishioners' rights of seclusion and dignity. *See Fibreboard Corp. v. Hartford Accident & Indem. Co.*, 16 Cal. App. 4th 492, 513–14 (1993). Other courts have held that childhood abuse and grooming implicate "invasion of privacy" offenses. *See W. Protectors Ins. Co. v. Shaffer*, 624 F. Supp. 2d 1292, 1296–97 (W.D. Wash. 2009).

While the Umbrella Policies expressly extend to the "childhood sexual abuse, harassment and/or assault" alleged in the CCVA Claims, the underlying policies do not so expressly apply. The critical difference lies in the definition of "occurrence":

- **Underlying (Centennial/Aetna):** "Occurrence" is limited to an "accident" that results in "bodily injury"[6]

---

[3] SUMF at ¶ 14 (Umbrella Policies' definition of "**PERSONAL INJURY**").
[4] SUMF at ¶ 1-7.
[5] SUMF at ¶ 14 (Umbrella Policies' definition of "**PERSONAL INJURY**").
[6] SUMF at ¶ 16 (underlying policies' definition of "**occurrence**"). Aetna Casualty and Surety Company k/n/a Travelers Casualty and Surety Company ("Travelers") also issued RCBO primary policies in effect from 6/18/81-7/21/81. *Id.* at ¶ 19.

- **Umbrella (Westchester):** "Occurrence" includes not only an "accident" but also a "happening or event … which unexpectedly and unintentionally causes injury to persons"[7]

California courts have consistently recognized that this difference is potentially outcome-determinative. Policies defining "occurrence" solely as an "accident" exclude coverage for intentional acts. But policies that extend to "happenings" or "events" ***do cover*** intentional conduct so long as the resulting injury was unintended from the standpoint of the insured. *United Pac. Ins. Co. v. McGuire Co.*, 229 Cal. App. 3d 1560, 1564–65 (1991); *Ins. Co. of Pa. v. City of Long Beach*, 342 Fed. App'x 274, 276 (9th Cir. 2009) ("The policies cover a portion of the City's liability for loss that is caused by an 'occurrence,' which is defined as 'an accident or event ... which results in personal injury, property damage, or public officials errors and omissions neither expected nor intended from the standpoint of the insured.' The policies, by including the term 'events' within an occurrence, cover intentional acts which cause harm unintended by the insured"); *Save Mart Supermarkets v. Underwriters at Lloyd's London*, 843 F. Supp. 597, 605 (N.D. Cal. 1994) (construing same definition of "occurrence" in Umbrella Policies). Other courts have applied the same reasoning in clergy-abuse coverage litigation. *Hartford Roman Cath. Diocesan Corp. v. Interstate Fire & Cas. Co.*, 905 F.3d 84, 93 (2d Cir. 2018) (construing same "occurrence" language: "The focus is on intention and expectation as to the resulting injury rather than the accident itself.").

Thus, even if the CCVA Claims are deemed not to arise from unexpected and unintentional conduct, the Umbrella Policies cover those "events" because RCBO neither intended nor expected the resulting injuries. By contrast, the underlying policies—restricted to "accidents"—provide no such protection.[8]

[7] SUMF at ¶ 14 (Umbrella Policies' definition of "**OCCURRENCE**").

[8] SUMF at ¶ 16 (underlying policies' definition of "**occurrence**").

**2. Umbrella coverage encompasses emotional and psychological occurrences that the underlying policies exclude.**

The divergence between the policies is even more stark with respect to injury definitions. The underlying policies restrict coverage to occurrences "which result[] in **bodily injury**," *i.e.*, only "bodily injury, sickness or disease … including death."[9] California courts construe such language to mean strictly ***physical*** injury to the body, excluding non-physical, emotional, or psychological harms. *Chatton v. Nat'l Union Fire Ins. Co.*, 10 Cal. App. 4th 846, 854 (1992).

The Umbrella Policies, however, expressly extend "personal injury" to occurrences involving non-physical harms including "shock, mental anguish and mental injury."[10] This broader grant of coverage captures precisely ***all*** the types of injuries and claims alleged in the CCVA Claims. For example, Plaintiff 178 alleged extensive grooming and harassment—including being secluded, exposed to sexualized talk, and shown a movie with nude women—and seeks damages for injuries such as anxiety, depression, flashbacks, anger, betrayal, loss of faith, interpersonal problems, humiliation, and suicidal ideation.[11] Similarly, Plaintiffs 557 and 1832 alleged either the perpetrator stripped naked or made the Plaintiffs strip naked.[12] These are all classic examples of occurrences involving emotional and psychological harms that fall outside underlying "bodily injury" coverage but squarely within the Umbrella Policies' broader "personal injury" coverage.

California law recognizes that where the umbrella policy covers claims that the underlying policies do not, the umbrella insurer must "fill the gap" to provide a defense. In *Am. States Ins. Co. v. Ins. Co. of Pa.*, 800 Fed. App'x 452, 454 (9th Cir. 2020), the Ninth Circuit affirmed that even where some claims were within the scope

---

[9] SUMF at ¶ 16 (underlying policies' definition of "**bodily injury**").
[10] SUMF at ¶ 14 (Umbrella Policies' definition of "**PERSONAL INJURY**").
[11] SUMF at ¶ 10.
[12] SUMF at ¶¶ 11-12.

of the underlying primary coverage, the umbrella insurer still had a primary duty to defend the additional claims that fell within its own broader coverage but outside the underlying policy. The same logic applies here: Westchester cannot avoid its defense obligation simply because some aspects of the CCVA Claims might trigger a defense under the underlying coverage. Its duty arises whenever there is a claim alleging "***any*** occurrence" that ***potentially*** falls within the Umbrella's indemnity coverage but outside the underlying.

In short, the mismatch between the narrow "bodily injury" clause in the underlying policies and the expansive "personal injury" grant in the Umbrella Policies creates a classic coverage gap. Under California law, that gap compels Westchester to step in as a primary defender of the CCVA Claims.

**3. Westchester's own litigation position concedes the gap.**

Westchester itself argues that the CCVA Claims do not arise from "unexpected and unintentional conduct" and therefore do not constitute an "occurrence."[13] That concession acknowledges precisely what RCBO argues: the CCVA Claims are potentially outside the scope of the underlying accident-only coverage. Stated differently, instead of being a defense to coverage, Westchester's litigation position is the very trigger of the Umbrella Policies' broader coverage obligations. By insisting the CCVA Claims do not qualify as an "accident," Westchester has confirmed the existence of the coverage gap that compels it to defend under Section II.

**D. Westchester's duty to defend extends to all CCVA Claims in which "sexual abuse, harassment and/or assault" potentially happened during the policy period.**

In sum, RCBO has easily satisfied its burden of establishing Westchester's duty to defend. The CCVA Claims (1) allege assaults and privacy violations that

[13] SUMF at ¶ 22.

plainly fall within the Umbrella's broad "event" and "personal injury" coverage but potentially outside the underlying accident-only definition, (2) seek damages for emotional and psychological occurrences expressly included in the Umbrella but excluded from the underlying "bodily injury" clause, and (3) are alleged by Westchester itself to fall outside the underlying scope of coverage.[14] Under *Legacy Vulcan* and *American States*, those gaps independently and collectively compel Westchester to defend the CCVA Claims in a primary capacity under Section II ("Defense Settlement").

Thus, RCBO seeks a ruling that Westchester's duty to defend extends to all CCVA Claims alleging one or more occurrences (*i.e.,* incidents of "sexual abuse, harassment and/or assault") potentially happening "during the policy period."[15] *Legacy Vulcan,* 185 Cal. 4th at 692 ("A duty to defend arises if facts alleged in the complaint, or other facts known to the insurer, *potentially* could give rise to coverage under the policy. The facts need only 'raise the possibility' that the insured will be held liable for covered damages.") (citations omitted).

## II. Separately, Section I ("Coverage") Independently Obligates Westchester to Immediately Pay RCBO's Defense Costs.

Even if Section II was not applicable (it is), Section I of the Umbrella Policies independently obligates Westchester to pay "ultimate net loss" (including immediate defense expenses) because RCBO has satisfied any "retained limit" obligation.[16]

---

[14] SUMF at ¶¶ 1-12.

[15] SUMF at ¶ 14 ("**IV POLICY PERIOD, TERRITORY**: This policy applies to occurrences happening anywhere during the policy period.").

[16] Importantly, Westchester's immediate duty to pay "ultimate net loss" (including defense expenses) is separate and distinct from its "drop down" duty to defend obligation "[i]n the event of the reduction or exhaustion of the aggregate limits of liability of the underlying policies listed in Schedule A by reason of losses paid thereunder" as provided in Insuring Agreement V (Retained Limit – Limit of Liability). RCBO does not contend, *inter alia,* that the Aetna policies are so exhausted and, in fact, affirmatively states that those policies are not

**A. Westchester's "ultimate net loss" obligation attaches once RCBO pays an amount equal to "the total of the applicable limits of the underlying policies listed in Schedule A."**

Unlike Section II, Section I provides "excess coverage" that applies after exhaustion of the insured's "retained limit" as follows:

> **V RETAINED LIMIT -- LIMIT OF LIABILITY**
>
> With respect to Coverage I (a). I (b) or I (c). or any combination thereof. the company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the greater of:
>
> > (a) the total of the applicable limits of the underlying policies listed in Schedule A hereof, and the applicable limits of any other insurance collectible by the insured[.][17]

While the second part of clause (a) references "applicable limits of any other insurance collectible by the insured," the California Supreme Court recently clarified that exhaustion of directly underlying limits is sufficient to trigger an excess carrier's ultimate net loss obligations. *Truck Ins. Exch. v. Kaiser Cement & Gypsum Corp.*, 16 Cal. 5th 67, 98 (2024) ("the insured may access the policies upon exhaustion of the directly underlying policies that were purchased for the same period"). Therefore, RCBO's retained limit burden requires only that it show payment of "the total of the applicable limits of the underlying policies listed in Schedule A."

**B. Courts uniformly construe "applicable limits" by Schedule A, not actual coverage.**

Courts construing identical language consistently hold that the "applicable limits" means the dollar amounts specified in Schedule A, regardless of whether the underlying policies actually provided coverage or even existed. *See, e.g., State Ins.*

---

exhausted and do not exhaust because they do not have an aggregate limit of liability.

[17] SUMF at ¶ 14 ("**V RETAINED LIMIT – LIMIT OF LIABILITY**")

*Fund v. Int'l Ins. Co.*, 251 A.D.2d 86, 87 (N.Y. App. Div. 1998) (this language refers to "the total of the amounts specified for each of the polices listed in Schedule A of the category of coverage applicable to the incident for which the parties' insured was sued, regardless of whether such listed policies actually provided coverage, and, if so, how much"); *Fried v. N. River Ins. Co.*, 710 F.2d 1022, 1026 (4th Cir. 1983) (rejecting argument that "applicable limits" referred to the total amount of coverage "*actually* provided" by the Schedule A policies and holding, instead, that the "applicable limits" were the "face values" of the listed Schedule A policies "regardless of whether those policies actually extended coverage with respect to the issues at bar"); *U.S. Fire Ins. Co. v. Charter Fin. Grp., Inc.*, 851 F.2d 957, 961 (7th Cir. 1988) ("[t]he term 'applicable limits,' in relation . . . to the Schedule A . . . policies, refers only to the category of coverage applicable to the incident from which the insured's liability arises," and, consequently, the "applicable" limit in that case "was clearly the $100,000 amount listed under property damage liability — the applicable category").

In other words, RCBO's retained limit obligation is determined by the scheduled amounts, not how the underlying policies actually apply. *State Ins. Fund*, 251 A.D.2d at 87 ("Thus, it does not avail [the excess insurer] that plaintiff's employers' liability policy, listed in Schedule A as having an 'applicable limit' of $100,000, may in fact have provided coverage that was unlimited."); *Liberty Mut. Ins. Co. v. Ins. Co. of State of Pa.*, 43 A.D.3d 666, 668 (N.Y. App. Div. 2007) ("Even though it appears that the coverage afforded by the AIG policy may have been unlimited in this case, the policy limit set forth in the Schedule of Underlying Insurance annexed to the Liberty policy controls the triggering of Liberty's excess coverage."); *Kalama Chem., Inc. v. Allianz Ins. Co.*, Case No. 90-2-05011-4, 1995 WL 17015061, at *6 (Wash. Super. Aug. 14, 1995) (excess policy is implicated when

the insured has incurred damages in the amount listed on the schedule, irrespective of actual limits in underlying policies).

### C. RCBO has undisputably satisfied its retained limit burden.

Per Endorsement no. 5, Schedule A specifies a total of $1.5 million in scheduled limits for general liability coverage as follows: (a) Aetna (6/18/81–7/1/81)—$500,000; (b) Aetna (7/1/81–7/21/81)—$500,000; and (c) Centennial (7/21/81–7/1/84)—$500,000.[18] RCBO has already paid well beyond that amount in connection with prior abuse claims.[19] Accordingly, RCBO has met any retained limit obligation, and Westchester's "ultimate net loss" obligation under Section I is triggered as a matter of law.

### D. Once triggered, Section I obligates immediate payment of defense costs.

Section I requires Westchester to pay "ultimate net loss," defined to include "[a]ll expenses … incurred by the insured in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages."[20] Under California law, this language imposes an immediate duty to pay defense costs. *Sempra Energy v. Associated Elec. & Gas Ins. Servs. Ltd.*, 772 F. Supp. 3d 1148, 1154 (C.D. Cal. 2025) (provision requiring insurer to indemnify "all expenses incurred ... in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages" created immediate duty to advance defense costs); *Gon v. First State Ins. Co.*, 871 F.2d 863, 868 (9th Cir. 1989) (loss defined to include "cost of investigation ... and defense of legal actions, claims or proceedings and appeals therefrom" immediately obligates insurer to "pay legal expenses as they are incurred, because an insured becomes legally obligated to pay legal expenses as soon as the services are rendered").

---

[18] SUMF at ¶ 15.

[19] SUMF at ¶ 23-31.

[20] SUMF at ¶ 14 (Umbrella Policies' definition of "**ULTIMATE NET LOSS**").

In sum, Westchester's Section I duty to pay "ultimate net loss" arose once RCBO satisfied the $1.5 million retained limit.[21] Its refusal to pay defense costs for the CCVA Claims constitutes a breach of contract.

**E. Westchester's duty to pay defense costs as "ultimate net loss" extends to all expenses that have not been paid by other insurers.**

Finally, similar to its Section II defense obligation, Westchester's obligation to pay defense costs as "ultimate net loss" extends to all CCVA Claims where one or more occurrences (*i.e.*, incidents of "sexual abuse, harassment and/or assault") potentially happened "during the policy period." *Sempra Energy*, 772 F. Supp. 3d at 1153-55 (holding that the duty to pay defense costs extended to the same set of claims as the duty to defend, that is, claims that "potentially seek damages within the coverage of the policy").

While the definition of "ultimate net loss" provides that "[t]his policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance,"[22] this sentence simply means that Section I does not apply to defense costs which have already been paid by other underlying insurers. *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, Case No. CV 04-0662 PHX-DGC, 2006 WL 1663437, at *5 (D. Ariz. June 12, 2006) (holding that this provision avoids "possible redundancy of payments" by ensuring that the excess policy does not provide payment for expenses that have already been paid by underlying insurers); *see also Montgomery Ward & Co., Inc. v. Imperial Cas. & Indem. Co.*, 81 Cal. App. 4th 356, 375 (2000) (finding this provision in the definition of "ultimate net loss" to be ambiguous but concluding that it does not "vitiate the defense provisions" of section 2 of the policy).

Taken together, Westchester's Section I duty to pay "ultimate net loss" (including defense costs) extends to all (1) expenses that have not actually been paid

---

[21] SUMF at ¶ 31.

[22] SUMF at ¶ 14 (Umbrella Policies' definition of "**ULTIMATE NET LOSS**").

by other insurers for (2) any CCVA Claims where one or more occurrences (*i.e.*, incidents of "sexual abuse, harassment and/or assault") potentially happened "during the policy period." And because it undisputed that neither Centennial nor Travelers are defending any of the CCVA Claims under the underlying policies, Westchester's Section I duty clearly extends—but is not limited to—any CCVA Claims where the potential for an occurrence falls solely within the Umbrella Policies' coverage period.[23]

## III. CONCLUSION

RCBO is entitled to summary judgment. Section II ("Defense Settlement") independently triggers Westchester's duty to defend because the CCVA Claims allege occurrence(s) that potentially fall within umbrella coverage but outside underlying insurance. In the alternative, Section I ("Coverage") obligates Westchester to fund RCBO's "ultimate net loss"—including immediate defense costs—because RCBO has satisfied its retained limit. For both reasons, RCBO is entitled to partial summary judgment that Westchester has breached its duty to defend the CCVA Claims.

---

[23] SUMF at ¶¶ 17 – 20.

Dated: September 22, 2025

Respectfully submitted,

By: <u>*/s/ Brent W. Vincent*</u>
Brent W. Vincent (*pro hac vice*)
brent.vincent@Lathropgpm.com
LATHROP GPM LLP
155 North Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: 312.920.3300
Facsimile: 312.920.3301

Andrew B. Breidenbach (CA Bar #281586)
abreidenbach@tocounsel.com
THEODORA ORINGHER PC
535 Anton Blvd., Suite 900
Costa Mesa, CA 92626
Telephone: 714.549.6200
Facsimile: 714.549.6201

Ronald A. Valenzuela (CA Bar #210025)
ronald.valenzuela@Lathropgpm.com
LATHROP GPM LLP
2049 Century Park East, Suite 3500S
Los Angeles, California, 90067-1623
Telephone: 310.789.4600
Facsimile: 310.789.4601

Alexander T. Brown (*pro hac vice*)
alexander.brown@Lathropgpm.com
Noah H. Nash (*pro hac vice*)
noah.nash@Lathropgpm.com
Caitlin M. Albaugh (*pro hac vice*)
caitlin.albaugh@Lathropgpm.com
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108
Telephone: 816.292.2000
Facsimile: 816.292.2001

Attorneys for Defendant/Counterclaim Plaintiff The Roman Catholic Bishop of Orange

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant/Counter-Plaintiff The Roman Catholic Bishop of Orange, certifies that this brief contains 4,345 words, which complies with the word limit of Central District of California Local Rule 11-6.1.

Dated: September 22, 2025

LATHROP GPM LLP

By: /s/ *Brent Vincent*
Brent Vincent
Attorney for The Roman Catholic Bishop of Orange