Richard B. Goetz (S.B. #115666)
*rgoetz@omm.com*
Zoheb Noorani (S.B. #253871)
*znoorani@omm.com*
**O'MELVENY & MYERS LLP**
400 South Hope Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Alexander E. Potente (S.B. #208240)
*alex.potente@clydeco.us*
Jason J. Chorley (S.B. #263225)
*jason.chorley@clydeco.us*
**CLYDE & CO US LLP**
150 California Street, 15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801

Attorneys for Plaintiff-Counterdefendant Westchester Fire Insurance Company as successor in interest to Industrial Underwriters Insurance Company

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WESTCHESTER FIRE INSURANCE COMPANY, a Pennsylvania corporation,<br><br>Plaintiff,<br><br>v.<br><br>THE ROMAN CATHOLIC BISHOP OF ORANGE, a California corporation sole, and DOES 1 through 50,<br><br>Defendants. | Case No. 8:24-cv-01539-MRA(ADSx)<br><br>**WESTCHESTER FIRE INSURANCE COMPANY'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>**<u>Accompanying Documents:</u>**<br>Statement of Uncontroverted Facts; Declaration of Rich Zajac; Proposed Order<br><br>Date: November 10, 2025<br>Time: 1:30 PM<br>Judge Mónica Ramírez Almadani<br>Courtroom 9B<br>Complaint Filed: July 11, 2024<br>Trial Date: None set |
| THE ROMAN CATHOLIC BISHOP OF ORANGE, a California corporation sole,<br><br>Counterclaimant,<br><br>v.<br><br>WESTCHESTER FIRE INSURANCE | |

| | |
|---|---|
| COMPANY, a Pennsylvania corporation,<br><br>Counterdefendant. | |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that on November 10, 2025 at 1:30 p.m. or as soon thereafter as the matter may be heard in this Court, located at 411 W. 4th Street, Courtroom 9B, Santa Ana, California 92701, plaintiff-counterdefendant Westchester Fire Insurance Company ("Westchester"), pursuant to Rule 56 of the Federal Rules of Civil Procedure, will and hereby does move this Court for an order entering partial summary judgment in favor of Westchester and against defendant-counterclaimant The Roman Catholic Bishop of Orange ("the Diocese") as to Westchester's first claim for relief (declaratory judgment) and the Diocese's first and second counterclaims (breach of contract and declaratory judgment, respectively) to the extent those counterclaims implicate the issue of whether Westchester owes a duty to defend and has an obligation to drop down in place of the Diocese's primary insurer notwithstanding the fact that neither the Diocese nor its primary insurer has paid the retained limit of Westchester's excess policies, on the grounds that there are no genuine disputes of material fact and Westchester is entitled to judgment as a matter of law.

This motion for partial summary judgment is based on this notice of motion and motion, the supporting memorandum of points and authorities, all pleadings and records filed herein, and such oral and documentary evidence or argument as may be presented at or before the time of the hearing.

This motion is made pursuant to stipulation and order of the Court, following multiple conferences of counsel pursuant to Central District Civil Local Rule 7-3; the parties were unable to reach a resolution to eliminate the need for this motion.

Dated: September 22, 2025

**O'MELVENY & MYERS LLP**

By: */s/ Richard B. Goetz*
Richard B. Goetz
Zoheb Noorani

Dated: September 22, 2025

**CLYDE & CO US LLP**

By: */s/ Jason J. Chorley*
Alexander E. Potente
Jason J. Chorley

Attorneys for Plaintiff-Counterdefendant Westchester Fire Insurance Company as successor in interest to Industrial Underwriters Insurance Company

# TABLE OF CONTENTS


Page

MEMORANDUM OF POINTS AND AUTHORITIES .......... 1

I INTRODUCTION AND SUMMARY OF ARGUMENT .......... 1

II BACKGROUND .......... 2

A. The Diocese's Primary Insurance. .......... 2

B. The Diocese's Umbrella and Excess Insurance. .......... 4

C. The Diocese Faces Hundreds of CCVA Suits. .......... 8

D. The Diocese's Demand for Coverage Prompted Westchester to Seek Declaratory Relief. .......... 9

III LEGAL STANDARD .......... 10

IV ARGUMENT .......... 10

A. Westchester Owes No Duty to Drop Down Upon the Insolvency of a Primary Carrier Under Its Policy Language. .......... 10

B. The Industrial Policies' Excess Defense Coverage Is Not Triggered Because Centennial's Primary Policies Are Not Exhausted. .......... 14

C. The Industrial Policies' Umbrella Defense Coverage Is Not Triggered Because Centennial's Primary Policies Unambiguously Provide Defense Coverage for the CCVA Claims. .......... 16

V CONCLUSION .......... 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bjork v. State Farm Fire & Cas. Co.*, 157 Cal. App. 4th 1 (2007) .......... 19

*Buss v. Superior Court*, 16 Cal. 4th 35 (1997) .......... 3, 17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 10

*Certain Underwriters at Lloyd's of London v. Superior Ct.*, 24 Cal. 4th 945 (2001) .......... 11

*Dart Industries, Inc. v. Superior Court*, 28 Cal. 4th 1059 (2002) .......... 5

*Deere & Co. v. Allstate Ins. Co.*, 32 Cal. App. 5th 499 (2019) .......... 16

*Denny's, Inc. v. Chicago Ins. Co.*, 234 Cal. App. 3d 1786 (1991) .......... 14

*Est. of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019 (9th Cir. 2008) .......... 10

*First State Ins. Co. v. Am. Home Assurance Co.*, 463 F. Supp. 3d 298 (D. Conn. 2020) .......... 14

*Fox Paine & Co., LLC v. Twin City Fire Ins. Co.*, 104 Cal. App. 5th 1034 (2024) .......... 14

*Great Western Drywall, Inc. v. Interstate Fire & Cas. Co.*, 161 Cal. App. 4th 1033 (2008) .......... 11

*Hartford Accident & Indem. Co. v. Cont'l Nat'l Am. Ins. Cos.*, 861 F.2d 1184 (9th Cir. 1988) .......... 3

*Hartford Casualty Insurance Company v. J.R. Marketing, L.L.C.*, 61 Cal. 4th 988 (2015) .......... 17

*J.C. Penney Cas. Ins. Co. v. M.K.*, 52 Cal. 3d 1009 (1991) .......... 19

*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Construction Co.*, 5 Cal. 5th 216 (2018) .......... 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) .......... 10

*Montrose Chem. Corp. of Calif. v. Sup.Ct.*, 6 Cal. 4th 287 (1993) .......... 17

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Powerine Oil Co., Inc. v. Superior Court*,
37 Cal. 4th 377 (2005) .......... 11, 12

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995) .......... 10

*Republic W. Ins. Co. v. Fireman's Fund Ins. Co.*,
241 F. Supp. 2d 1090 (N.D. Cal. 2003) .......... 18

*Reserve Insurance Co. v. Pisciotta*,
30 Cal. 3d 800 (1982) .......... 10, 11

*SantaFe Braun, Inc. v. Ins. Co. of N. Am.*,
52 Cal. App. 5th 19 (2020) .......... 11

*Span, Inc. v. Associated Int'l Ins. Co.*,
227 Cal. App. 3d 463 (1991) .......... passim

*Ticor Title Ins. Co. v. Emps. Ins. of Wausau*,
40 Cal. App. 4th 1699 (1995) .......... 14, 18

*Travelers Cas. & Sur. Co. v. Am. Int'l Surplus Lines Ins. Co.*,
465 F. Supp. 2d 1005 (S.D. Cal. 2006) .......... 20

*Truck Ins. Exch. v. Unigard Ins. Co.*,
79 Cal. App. 4th 966 (2000) .......... 2

*Waller v. Truck Ins. Exch., Inc.*,
11 Cal. 4th 1, *as modified on denial of reh'g* (Oct. 26, 1995) .......... 11

*Wells Fargo Bank v. Cal. Ins. Guar. Ass'n*,
38 Cal. App. 4th 936 (1995) .......... passim

**Statutes**

Cal. Code Civ. P. § 340.1 .......... 9

**Rules**

Fed. R. Civ. P. 56(a) .......... 11

**Other Authorities**

*Commercial General Liability Policy (CGL)*, 1 California Ins. Law Dictionary & Desk Ref. (2024 ed.) .......... 2, 3

*Primary Insurer's Insolvency as Affecting Excess Insurer's Liability*,
85 A.L.R. 4th 729 .......... 6

*Primary/Excess Insurance*, 3 California Ins. Law Dictionary & Desk Ref. (2024 ed.) .......... 5

*Umbrella Policy*, 4 California Ins. Law Dictionary & Desk Ref. (2024 ed.) .......... 5

# MEMORANDUM OF POINTS AND AUTHORITIES

## I INTRODUCTION AND SUMMARY OF ARGUMENT

This matter concerns the roles of insurers in underlying sexual-abuse actions against the Roman Catholic Bishop of Orange (the Diocese). Normally, the Diocese would seek defense and indemnity coverage from its primary insurer, Centennial Insurance Company. But Centennial is insolvent and no longer exists. So the Diocese now seeks to leapfrog its primary policies and demand coverage from its excess-umbrella insurer, Westchester Fire Insurance Company—even though the Westchester policies expressly disclaim a defense for occurrences covered by underlying insurance. Further, Westchester has no obligation to "drop down" and defend on account of Centennial's insolvency, as neither the Diocese nor Centennial has paid the $500,000 per-occurrence limit under Centennial's policies in judgments or settlements to which Westchester consented in order to trigger coverage under the Westchester policies.

The Diocese's demand prompted Westchester to bring this declaratory judgment action to resolve whether Westchester's insurance policies require it to "drop down" in place of the Centennial primary policies. Specifically, Westchester sought a determination that it has no present duty to defend tort claims brought against the Diocese under the California Child Victims Act (CCVA).

Granting Westchester's request is the only way to honor the parties' bargain. The Diocese did not buy primary coverage from Westchester. It instead selected Centennial as its first line of defense, and elected to obtain only less expensive excess-umbrella coverage from Westchester. Those excess-umbrella policies, in turn, explicitly state over and over that Westchester's obligations start only after the Diocese or its primary insurer has paid the limit of the underlying primary coverage. Until then, Westchester owes no duty to defend or indemnify the Diocese. Westchester did ***not*** agree to insure the Diocese against the risk that the Diocese's

primary insurer would become insolvent. But with the benefit of hindsight, the Diocese insists that Westchester bear the risk of the Diocese's own choices.

Existing precedent resolves this coverage issue. Two California decisions, *Span, Inc. v. Associated Int'l Ins. Co.*, 227 Cal. App. 3d 463 (1991) and *Wells Fargo Bank v. Cal. Ins. Guar. Ass'n*, 38 Cal. App. 4th 936 (1995), have rejected a duty to drop down in place of an insolvent insurer based on substantively identical policy language requiring exhaustion by actual payment of the underlying limits. Other provisions in the Westchester policies reinforce the conclusion mandated by these decisions.

The Court should enter partial summary judgment for Westchester and hold that Westchester has no present duty to defend.

## II BACKGROUND

### A. The Diocese's Primary Insurance.

The Diocese obtained primary commercial general liability insurance coverage through Centennial from July 21, 1981, to July 1, 1987, under policy 291704553. SUF 1.[1] A general liability or primary policy, as the name indicates, "is intended to cover ***general*** liability," providing "the insured with the broadest spectrum of protection against liability for unintentional and unexpected personal injury or property damage arising out of the conduct of the insured's business." *Commercial General Liability Policy (CGL)*, 1 California Ins. Law Dictionary & Desk Ref. § C48 (2024 ed.) (emphasis original). Under a general liability policy, the insurer owes the insured a duty to defend in actions brought against the insured seeking damages for a covered claim. *Id.* That duty to defend extends to the entire action. *Truck Ins. Exch. v. Unigard Ins. Co.*, 79 Cal. App. 4th 966, 978 (2000) ("[A]s between a primary insurer and an excess insurer, the former is solely

[1] The parties have stipulated to the best available evidence and the terms and conditions of the Centennial policies. SUF 2.

responsible for defense costs even though the claim against the insured may be for a sum in excess of the primary coverage." (emphasis omitted)); *see Buss v. Superior Court*, 16 Cal. 4th 35, 58-59 (1997). The likelihood that a primary insurer will have to respond repeatedly by defending and indemnifying against a wide variety of commonly asserted claims—most of which never exceed the limits of the primary policy—means that primary insurance premiums are generally much higher than those for excess or umbrella coverage. *See Hartford Accident & Indem. Co. v. Cont'l Nat'l Am. Ins. Cos.*, 861 F.2d 1184, 1187 (9th Cir. 1988).

The Centennial policies have per-occurrence limits of $500,000. SUF 3.[2] The Centennial policies have no applicable aggregate limit. SUF 4. The per-occurrence limits apply until $500,000 is paid in settlement or judgment for each occurrence. SUF 5. As with all general liability policies, defense costs do not erode per-occurrence limits: the Centennial policies provide a defense until $500,000 per occurrence is paid in settlement or judgment.

Under the Centennial primary policies, Centennial owed the Diocese duties to defend and to pay the limits for losses within the coverage of its policies. SUF 6. The Diocese has not disputed that the Centennial policies cover the CCVA abuse claims at issue here. Indeed, when the Diocese faced similar abuse claims in the early 2000s, when Centennial was solvent, the Diocese sought coverage from Centennial, and Centennial in turn paid both defense and indemnity. SUF 7.

But Centennial no longer exists. It has been liquidated and its assets distributed. SUF 8. So it cannot fulfill its obligations, including defending the Diocese in the underlying actions or paying settlements or judgments.

---

[2] The parties have not located complete copies of the original Centennial policy documents, but the Industrial excess-umbrella policies described below identify the Centennial primary policies' limits.

Centennial has not paid its $500,000 limit for any CCVA abuse claim. SUF 9. Nor has the Diocese satisfied the Centennial per-occurrence limit in judgments or settlements for any claim to which Westchester consented. SUF 10.[3]

**B. The Diocese's Umbrella and Excess Insurance.**

Because primary insurance coverage is subject to moderate limits and does not extend to cover every type of claim, organizations often obtain excess coverage (for claims that exceed primary limits) and umbrella coverage (for types of claims not covered by primary insurance). Coverage under an excess policy begins "only after a predetermined amount of primary coverage is exhausted." *Primary/Excess Insurance*, 3 California Ins. Law Dictionary & Desk Ref. § P78 (2024 ed.). The existence of primary coverage therefore "greatly reduces [the excess insurer's] risk of loss." *Id.* Further, under California law, an excess insurer "has no duty to defend until the primary policy is exhausted." *Id.* This, too, reduces the excess insurer's risk. These reduced risks "translate[] into a reduced premium to the insured" compared to primary coverage. *Span*, 227 Cal. App. 3d at 474.

Umbrella policies "fill[] any gaps in coverage left open by the underlying insurance." *Wells Fargo*, 38 Cal. App. 4th at 940 n.2 (internal alterations and quotations omitted). An umbrella policy "may provide additional primary coverage, i.e. broader coverage than contained in the primary policy." *Umbrella Policy*, 4 California Ins. Law Dictionary & Desk Ref. § U2 (2024 ed.) (noting example of commercial general liability excess insurer that "promised to provide the insured with a defense to claims for advertising liability, which was 'not covered' by certain

[3] The Diocese has settled multiple abuse claims over Westchester's objection for amounts in excess of the $500,000 per-occurrence limit of the Centennial policies. Westchester agreed to defend those claims in lieu of agreeing to settle, but the Diocese proceeded to effect those settlements over Westchester's objection. SUF 10. This motion addresses the duty to defend, not the duty to indemnify (which is subject to separate coverage arguments and has been stayed).

primary policies"). Because this "fill-in coverage" applies to specified categories of less-common claims, umbrella policies are likewise "sold at more moderate prices than primary coverage." *Wells Fargo*, 38 Cal. App. 4th at 949. And like excess coverage, "umbrella coverage does not automatically result in drop down coverage." *Id.* at 947.[4]

Here, the Diocese originally purchased excess-umbrella coverage from Industrial Underwriters Insurance Company under commercial umbrella policy no. JU 835-8295, which spanned consecutive policy periods from June 18, 1981, to July 1, 1982; July 1, 1982, to July 1, 1983; and July 1, 1983, to July 1, 1984 (collectively the "Industrial policies"). SUF 11. Westchester is the successor in interest to Industrial with respect to the Industrial policies. SUF 12.

Neither the Diocese—which as the insured bears the burden of proving a policy's terms, *see Dart Industries, Inc. v. Superior Court*, 28 Cal. 4th 1059, 1071 (2002)—nor Westchester has located complete copies of the original policy documents. SUF 13. But the Industrial policies refer to a standardized template (or "specimen form") identified as 1U001 R2 (4/80). SUF 14. The parties stipulated to the best available evidence and the terms and conditions of the Industrial policies issued to the Diocese. SUF 15. Further, schedules to the Industrial policies identify the Centennial policies as underlying insurance and recite their $500,000 per-occurrence limit. SUF 16.

The Industrial policies have both excess and umbrella provisions: excess coverage for claims that exceed the $500,000 limit of the Diocese's primary coverage through Centennial and umbrella coverage for certain claims that

---

[4] "Drop-down coverage occurs when an insurance carrier of a higher level of coverage is obligated to provide the coverage that the carrier of the immediately underlying level of coverage had agreed to provide." *Primary Insurer's Insolvency as Affecting Excess Insurer's Liability*, 85 A.L.R. 4th 729, § 1[a] n.4.

Centennial's primary policies were not written to cover. Specifically, the Industrial policies include the following provisions:

***Coverage***. "The Company [i.e., Westchester] agrees to pay on behalf of the insured ***the ultimate net loss in excess of the retained limit hereinafter stated***, which the insured may sustain by reason of liability imposed upon the insured by law, arising out of an occurrence or assumed by the insured under contract for: (a) Personal Injury Liability …." SUF 17 (emphasis added).[5] The definition for "Ultimate Net Loss" specifies: "**This policy shall not apply to defense, investigation, settlement, or legal expenses covered by underlying insurance**." SUF 21.

***Loss Payable***. "Liability of the company with respect to any one occurrence shall not attach unless and until ***the insured***, the company in behalf of the insured, or the insured's ***underlying insurer***, ***has paid the amount of the retained limit***." SUF 22 (emphasis added).

***Retained Limit—Limit of Liability***. "With respect to Coverage I (a) [i.e., for Personal Injury Liability] …, the company's liability shall be only for the ultimate net loss in excess of the insured's retained limit defined as the ***greater of***: (a) ***the total of the applicable limits of the underlying policies listed in Schedule A hereof***, and the applicable limits of any other insurance collectible by the insured; or (b) an

[5] The Industrial policies define "occurrence" in the personal-injury context as "an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period." SUF 18. The term "Personal Injury" in the abuse context "means (a) bodily injury, sickness, disease, disability, shock, mental anguish and mental injury; … and (e) assault and battery not committed by or at the direction of the insured…." SUF 19. The "Policy Period, Territory" provision further specifies that "[t]his policy applies to occurrences happening anywhere during the policy period." SUF 20.

amount as stated in Item 4(C) of the declarations as the result of any one occurrence not covered by the said policies or insurance." SUF 23 (emphasis added).

As relevant to clause (a), which concerns excess coverage, the schedules list the Centennial policies. Again, the limit of the Centennial policies is $500,000 per occurrence. The Centennial policies have no aggregate limit in this context. *Supra* at 3. Clause (b) concerns umbrella coverage.

The Retained Limit section further provides that once Centennial's $500,000 per-occurrence limit has been paid, Westchester may be required to defend and indemnify the Diocese subject to the limitations and limits of the Industrial policies: "In the event of the reduction or exhaustion of the aggregate limits of liability of the underlying policies listed in Schedule A ***by reason of losses paid thereunder***, this policy, subject to the above limitations, (1) in the event of reduction, shall pay the excess of the reduced underlying limits; or (2) in the event of exhaustion, shall continue in force as underlying insurance." SUF 24 (emphasis added).

***Defense Settlement***. This provision supplies umbrella coverage and provides that if an "occurrence" is not covered by the Centennial policies, then Westchester shall defend the Diocese: "With respect to any occurrence not covered, as warranted, by the underlying policies listed in Schedule A hereof or not covered by any other underlying insurance collectible by the insured, but covered by the terms and conditions of this policy except for the amount of retained limit specified in Item 4(C) of the declarations, the company shall: (a) defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient." SUF 25.

***Underlying Insurance***. This provision provides that Westchester's defense obligations attach only after the Centennial policies are exhausted: "If underlying

insurance is exhausted by any occurrence, the company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier." SUF 26.

### C. The Diocese Faces Hundreds of CCVA Suits.

Because Centennial no longer exists, the Diocese hopes to bypass its Centennial primary policies and obtain coverage directly from Westchester to fund the defense of—and to pay potential settlements and judgments arising from—numerous CCVA tort actions now pending against the Diocese. SUF 27. These abuse suits against the Diocese now total over 200 and have been coordinated in JCCP 5101. The plaintiffs allege that the very clergy (and others in the Diocese's senior leadership) entrusted with the care of children instead exploited their positions to perpetrate sexual abuse against these vulnerable minors. SUF 28. The alleged abuse spanned from the 1970s through the 1990s. SUF 29.

In 2005, the Diocese settled approximately 90 suits alleging similar abuse. SUF 30. It now faces new claims with different plaintiffs under the CCVA, *see* Cal. Code Civ. P. § 340.1 *et seq.*, enacted in 2019, which reopened the statute of limitations for abuse victims. The CCVA allows survivors of child sexual assault to sue the Diocese until their 40th birthday or within five years of the date the plaintiff discovers or reasonably should have discovered that psychological injury or illness occurring after the age of majority was caused by the sexual assault, whichever is later. The CCVA also opened a three-year "revival window" during which all survivors (regardless of age) were permitted to file civil lawsuits. This window opened on January 1, 2020, and closed on December 31, 2022.

In the CCVA litigation, hundreds of plaintiffs allege that the Diocese or its affiliates knew about the sexual abuse of minors. SUF 31. They further allege that

the Diocese or its affiliates knowingly hid that abuse and hindered efforts to prevent it. SUF 32. And they allege that the Diocese or its affiliates failed to stop the sexual abuse, covered it up, and lied about it. SUF 33.

**D. The Diocese's Demand for Coverage Prompted Westchester to Seek Declaratory Relief.**

The Diocese asserts that Westchester has a present defense and indemnity obligation under the Industrial policies for the CCVA claims against the Diocese. SUF 27. Westchester has not agreed to defend or indemnify the Diocese unless and until the Diocese satisfies the underlying limit of the Centennial policies, subject to the terms and conditions of the Centennial policies and the Industrial policies. SUF 34.

To resolve questions about when its policies attach and to ultimately address other issues fundamental to coverage—such as whether the Diocese expected or intended the abuse that occurred—Westchester initiated this declaratory judgment action. Westchester seeks a judicial determination of whether it has a duty to drop down in place of Centennial and defend or indemnify the CCVA suits under the Industrial policies. SUF 35. Westchester seeks a declaration that it has no present duty to defend or indemnify those suits unless and until the Diocese satisfies the Centennial policies' $500,000 per-occurrence limit. SUF 36. The Diocese counterclaimed, seeking (among other things) defense and indemnity coverage from Westchester for CCVA suits. SUF 37.

The parties stipulated, and the Court ordered, that "[a]ll causes of action not related to the drop-down … issue are stayed." Order, ECF No. 46. As a result, whether Westchester has any duty to indemnify is not before the Court. The Court further directed the parties to file cross-motions for partial summary judgment on the drop-down issue: whether Westchester has a duty to defend and obligation to drop down in place of the Diocese's insolvent primary carrier, Centennial, despite

the fact that neither the Diocese nor Centennial has paid the $500,000 per-occurrence limit for claims for which the Diocese seeks a defense. *See id.* The parties engaged in document productions and written discovery related to the drop-down issue.

## III LEGAL STANDARD

The Court should enter summary judgment if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1432 (9th Cir. 1995). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party can create a "genuine" dispute on a material issue only by adducing admissible evidence on the issue sufficient for a reasonable jury to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Celotex*, 477 U.S. at 325. "[B]are allegations without evidentiary support" do not create a genuine factual dispute. *Est. of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1033 n.14 (9th Cir. 2008).

## IV ARGUMENT

### A. Westchester Owes No Duty to Drop Down Upon the Insolvency of a Primary Carrier Under Its Policy Language.

The Court is bound to follow the principles established by *Reserve Insurance Co. v. Pisciotta*, 30 Cal. 3d 800 (1982), the "leading California case on the responsibility of an excess insurer to assume the position of an insolvent primary insurer." *Span*, 227 Cal. App. 3d at 474. *Reserve*, in turn, "held the issue must be resolved based upon the ***wording*** of the insurance contract." *Id.* (emphasis original).

It is thus "the excess policy's express language" that controls "whether an excess insurer is obligated to bear the risk of an underlying insurer's insolvency."

*Wells Fargo*, 38 Cal. App. 4th at 942. Courts "ask whether the wording of the policy requires the excess insurer to provide the coverage that the primary insurer would have assumed had it not become insolvent." *Span*, 227 Cal. App. 3d at 475 (quoting *Reserve*, 30 Cal. 3d at 814; internal alterations omitted). "[I]nterpretation of an insurance policy is a question of law" that may be resolved on summary judgment. *Waller v. Truck Ins. Exch., Inc.*, 11 Cal. 4th 1, 18, *as modified on denial of reh'g* (Oct. 26, 1995).

"Words used in an insurance policy are to be interpreted according to the plain meaning which a layman would ordinarily attach to them." *Reserve*, 30 Cal. 3d at 807. "Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists." *Id.* "The fact that a term is not defined in the policies does not make it ambiguous." *SantaFe Braun, Inc. v. Ins. Co. of N. Am.*, 52 Cal. App. 5th 19, 24 (2020) (quoting *Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 389-90 (2005)). "Nor does disagreement concerning the meaning of a phrase, or the fact that a word or phrase isolated from its context is susceptible of more than one meaning." *Id.* (internal alterations and quotations omitted). "Language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract." *Powerine Oil*, 37 Cal. 4th at 391 (internal alterations and quotations omitted). Even when different language might "promote clarity," "the fact that language could be more explicit does not render it ambiguous." *Great Western Drywall, Inc. v. Interstate Fire & Cas. Co.*, 161 Cal. App. 4th 1033, 1042 (2008) (quotations omitted); *see Certain Underwriters at Lloyd's of London v. Superior Ct.*, 24 Cal. 4th 945, 969-70 (2001) ("That the provision imposing the duty to indemnify happens to be limited to money ordered by a court more impliedly than expressly is of no consequence. An implied limitation is sufficient; an express limitation is not necessary. Neither is it of any consequence that the provision

imposing the duty to indemnify with its more implied than express limitation might be less conspicuous, plain and clear than it would have been with a more express than implied limitation." (quotations and citations omitted)).

*Span* cogently applied these governing rules. There, the Court of Appeal concluded that the phrase "'exhaustion … by reason of losses paid thereunder,' or similar language precludes an obligation of the excess insurer to drop down upon the insolvency of the primary carrier." 227 Cal. App. 3d at 477-48. Crucially, this language—the same language as in the Industrial policies—"requires exhaustion of the underlying limit by payment before the excess insurer must respond" to defend or indemnify. *Id.* at 480. "Exhaustion by insolvency is insufficient." *Id.* Under this language, the court held that the excess insurer had no duty to drop down and was entitled to summary judgment on the issue because neither the insolvent primary insurer nor the insured had paid the limit of the primary coverage. *Span* joined "numerous" non-California cases to reach the same conclusion, and emphasized that this policy language "has prevented 'drop down' in every jurisdiction which has construed a policy with that phrase." *Id.* at 477.

*Span* rejected the insured's argument that the policy language was ambiguous merely because it did not expressly address the possibility that the primary insurer may become insolvent. The court explained that "California law … requires only that ambiguity be resolved in favor of the insured. It does not require the policy to make specific provision for the insolvency of the primary carrier." *Id.* at 477.

The Supreme Court of California has cited *Span* approvingly. Addressing a Loss Payable provision nearly identical to the one found in the Industrial policies, the Court held that "the [excess-umbrella] insurer's indemnification obligation … does not commence until any underlying policy limits have been exhausted by actual payment of a covered loss." *Powerine Oil*, 37 Cal. 4th at 402-03.

In *Wells Fargo*, the Court of Appeal followed the reasoning of *Span*, affirming a summary judgment ruling for a third-level excess insurer and rejecting the insured's argument that the insurer had a duty to drop down to defend or indemnify after the second-level insurer became insolvent. Like the Industrial policies, the third-level insurer's policy provided both excess and umbrella coverage. As to the excess coverage, the policy in *Wells Fargo* adopted a term stating that only payment of loss eroded the underlying limits of liability:

> In the event of reduction or exhaustion of the aggregate limits designated in the underlying policy or policies ***solely by payment of losses*** in respect to accidents or occurrences during the period of such underlying policy or policies, it is hereby understood and agreed that such insurance as is afforded by this policy shall apply in excess of the reduced underlying limit or, if such limit is exhausted, shall apply as underlying insurance, notwithstanding anything to the contrary in the terms and conditions of this policy.

38 Cal. App. 4th at 941 (emphasis original). This language "cannot [be] meaningfully distinguish[ed] … from the language the court considered in *Span*." *Id*. at 945. And the court emphasized that "[e]very out-of-state court that has interpreted language essentially identical to [this provision] has concluded that it ***unambiguously*** precludes 'dropping down.'" *Id.* (emphasis original) (citing cases).

The *Wells Fargo* court then explained why the result did not change despite the fact that the policy also contained an umbrella provision. The policy at issue there—again, similar to the Industrial policies—stated that the third-level excess insurer "shall only be liable for the ultimate net loss the excess of either (a) the limits of the underlying insurances as set out in the attached schedule in respect of each occurrence ***covered*** by said underlying insurances[;] or (b) the amount as set out in item 2(c) of the Declarations [$10,000] in respect of each occurrence ***not covered*** by said underlying insurances." *Id.* at 946 (emphasis original; internal alterations omitted). The *Wells Fargo* court rejected the insured's argument that "covered" referred to whether insurance proceeds were collectible from an

underlying insurer. Rather, in the drop-down setting, "covered" and "not covered" unambiguously "refer[] to the ***scope*** of the underlying insurance." *Id.* at 948 (emphasis original). That is, the umbrella coverage unambiguously applied to losses that were not covered by underlying insurance, not to losses that were covered but not paid. It further reasoned that, "[i]f the term 'covered' is even arguably ambiguous, the meaning [the insured] ascribes to the term is not within the objectively reasonable expectations of the insured." *Id.* at 949 (quotations omitted). That is because, under the policy, "an insured may not 'reasonably expect' that an umbrella insurer will automatically assume the risk of the underlying insurer's insolvency." *Id.*

No California decision holds that the policy language in *Span* or *Wells Fargo* imposes a duty on an excess insurer to drop down upon the insolvency of a primary insurer. And California and other courts continue to follow *Span* and *Wells Fargo*. *See, e.g.*, *Fox Paine & Co., LLC v. Twin City Fire Ins. Co.*, 104 Cal. App. 5th 1034, 1048 (2024); *First State Ins. Co. v. Am. Home Assurance Co.*, 463 F. Supp. 3d 298, 317 (D. Conn. 2020).[6] These precedents bind this Court. "California case law has consistently protected the limited and shielded position of the excess carrier when the obligations of the excess carrier are set in clear phrases." *Ticor Title Ins. Co. v. Emps. Ins. of Wausau*, 40 Cal. App. 4th 1699, 1708 (1995).

**B. The Industrial Policies' Excess Defense Coverage Is Not Triggered Because Centennial's Primary Policies Are Not Exhausted.**

The Industrial policies expressly foreclose any duty to drop down upon the primary carrier's insolvency. A straightforward application of *Span* and *Wells Fargo* resolves this issue. Here, the Retained Limit provisions of the Industrial

[6] *See also Denny's, Inc. v. Chicago Ins. Co.*, 234 Cal. App. 3d 1786, 1793-94 (1991) (policy unambiguously foreclosed requiring third-level excess insurers to "drop down" upon insolvency of second-level excess insurer).

policies contain the same "by reason of losses paid thereunder" language that *Span* concluded was dispositive. *Supra* at 12. As *Span* explained, this language "unambiguously contemplates 'exhaustion' of the underlying insurance only by ***payment*** of the underlying limits either by the insured or its primary carrier." 227 Cal. App. 3d at 476 (emphasis original). "Because only ***payment*** of the underlying limit will trigger [the excess insurer's] insuring agreement, insolvency of the primary carrier is excluded, indirectly, but unambiguously, as a means of exhaustion of the underlying policy." *Id.* at 477 (emphasis original). The similar provision in *Wells Fargo* "cannot [be] meaningfully distinguish[ed]." 38 Cal. App. 4th at 945.

Under *Span*, Westchester is justified in relying on this language to prevent drop down upon Centennial's insolvency. "Excess insurers understandably" prefer not "to deviate from terminology that has been accepted." *Span*, 227 Cal. App. 3d at 477. The Retained Limit provision expressly limits Westchester's liability to "the ultimate net loss in excess of [the Diocese's] retained limit," which is "defined as … the ***total*** of the applicable limits of the underlying policies"—i.e., $500,000—"***and*** the applicable limits of any other insurance collectible by the insured." SUF 23 (emphasis added). And this is an even clearer case than *Span*. The Loss Payable provision specifies that Westchester has no liability "unless and until ***the insured*** … or ***the insured's underlying insurer***, ***has paid*** the amount of the retained limit." SUF 22 (emphasis added). Neither has done so.

The parties did not strike a bargain requiring Westchester to drop down upon Centennial's insolvency, before the Diocese or Centennial have paid the retained limit of the underlying policies. Rewriting the Industrial policies to impose that obligation would improperly transform Westchester into a primary insurer. It would also create a windfall to the Diocese for which it did not bargain.

### C. The Industrial Policies' Umbrella Defense Coverage Is Not Triggered Because Centennial's Primary Policies Unambiguously Provide Defense Coverage for the CCVA Claims.

The only other circumstance in which Westchester would "drop down" to provide a defense is where Centennial's policies do not cover an occurrence but Industrial's umbrella policies do. That is not the case here.

The Industrial umbrella policies provide a defense only "[w]ith respect to ***any occurrence not covered***, as warranted, by the underlying policies." SUF 25 (emphasis added). In the drop-down context, the term "covered" "is not ambiguous." *Wells Fargo*, 38 Cal. App. 4th at 948. It "refer[s] to the ***scope*** of the underlying insurance." *Id.* In other words, "a layperson would understand that a claim is 'covered by underlying insurance' if it falls within the scope of coverage of that insurance, and is 'not covered by underlying insurance' if it falls outside the scope of insurance coverage." *Id.* at 948-49. That something is "'covered' … has nothing to do with 'collectability,' or the ability to take in payment" (which arises when, as here, the primary insurer becomes insolvent). *Id.* (quotations omitted); *see also Deere & Co. v. Allstate Ins. Co*., 32 Cal. App. 5th 499, 519 (2019) ("Coverage is the ***totality of risks*** contained in a contract whereby an insurer undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event.") (emphasis original).[7] Thus, because the CCVA claims are within the scope of Centennial's coverage, its insolvency is irrelevant.

---

[7] Industrial's umbrella coverage provision does refer to "collectible" insurance, but solely in reference to "other insurance," not "the underlying [Centennial] policies." SUF 25. Therefore, this provision lends no support to the Diocese. Just the opposite: the fact that the Industrial policies refer to collectability in a different setting—but ***not*** in connection with the Centennial policies—only confirms that the parties did not bargain for Westchester to bear the risk of Centennial's insolvency. For this reason, it is no surprise that *Span* and *Wells Fargo*, both of which dealt with near-identical language, each rejected the argument

The Diocese asserts that the Industrial policies provide broader coverage than the Centennial policies and therefore Westchester must defend the Diocese under its umbrella coverage. The Diocese seeks to conflate the duty to indemnify with the duty to defend. Insurers with a duty to defend are obligated to defend any claims that are at least potentially covered. *See Montrose Chem. Corp. of Calif. v. Sup. Ct.*, 6 Cal. 4th 287, 300 (1993) (holding that a defense is excused only when "the third party complaint ***can by no conceivable theory raise a single issue which could bring it within the policy coverage***" (emphasis original)); *Wells Fargo*, 38 Cal. App. 4th at 948-49. Once the insurer's defense obligation is triggered, it owes the insured a "complete" defense. *Hartford Casualty Insurance Company v. J.R. Marketing, L.L.C.*, 61 Cal. 4th 988, 991 (2015) ("This court has long maintained that if any claims in a third party complaint ... are even potentially covered by the [liability] policy, the insurer must provide its insured with a defense to ***all*** claims." (emphasis added)). That is, if part of the claim is within the scope of indemnity and part is not, the primary insurer is obligated to defend the insured for ***both*** the potentially covered and not covered parts of the claim until it is clear there is no potential for coverage at all. *Buss*, 16 Cal. 4th at 58-59 ("To defend immediately, [the primary insurer] must defend entirely. It cannot parse the claims, dividing those that are at least potentially covered from those that are not.").

Here, the CCVA suits allege damages caused by an occurrence during the Centennial policies that are potentially covered under those policies. These suits therefore implicate the Centennial policies' obligation to defend the Diocese. Once Centennial's defense obligation is triggered, the Diocese is owed a "complete" defense, regardless of whether there are certain parts of the claim that may not be covered. *Buss*, 16 Cal. 4th at 58-59. Because it is indisputable that the CCVA

---

that similar language created a duty to drop down. *See Span*, 277 Cal. App. 3d at 478; *Wells Fargo*, 38 Cal. App. 4th at 950-52.

claims are potentially covered under the Centennial policies, the CCVA claims are covered for purposes of the duty to defend under those policies.

When a primary insurer owes a defense, an umbrella insurer does not. California law is clear that where a primary insurer's defense obligation exists, regardless of whether the primary insurer fulfills that obligation, the umbrella defense coverage obligation is not triggered. *See Ticor*, 40 Cal. App. 4th at 1709 (umbrella insurer had no duty to drop down after primary insurer's wrongful refusal to defend because the term "'coverage' has nothing to do with how, in reality, the insurer acts with respect to its insurance obligations"); *see also Republic W. Ins. Co. v. Fireman's Fund Ins. Co.*, 241 F. Supp. 2d 1090, 1098 (N.D. Cal. 2003) ("What the court's ruling in the *Ticor* case means as applied to the case at bar is that the Republic Western policy becomes primary (steps down) only if the primary insurance policy (Fireman's Fund) does not include coverage for the costs of defending the [underlying] lawsuit."). Thus, as long as Centennial was obligated to provide a full defense—and it was—Westchester's umbrella coverage is not triggered, regardless of whether Centennial in fact provided the defense.

In any event, the Diocese is also wrong about the comparative scope of Centennial's and Industrial's policies for purposes of the CCVA claims. The Diocese argues that the Industrial policies provide broader coverage for emotional distress and have a broader definition of occurrence than the Centennial policies. This is not accurate. The Diocese appears to rely on the definition of personal injury as including not just "bodily injury" (like in the Centennial policies), but also "shock, mental anguish and mental injury" and "assault and battery not committed by or at the direction of the insured." SUF 19. However, the defense provision of the Industrial policies does not hinge on whether the "personal injury" is not covered, but whether the "occurrence" is not covered. The alleged "occurrence" is the negligent supervision, hiring, and retention of clergy members accused of sexual

abuse, which would also constitute assault and battery. The alleged "occurrence" is the same, regardless of the alleged injury. Both policies cover emotional distress caused by bodily injury and both require an accident, neither expected nor intended from the perspective of the insured. SUF 18, 38.

Under California law, in abuse claims, including the underlying CCVA claims, the bodily injury is "inherent" in abuse and occurs when the physical contact occurs. *See J.C. Penney Cas. Ins. Co. v. M.K.*, 52 Cal. 3d 1009, 1028 (1991). California law does not recognize compensable or covered loss for emotional distress untethered to bodily injury. *See Bjork v. State Farm Fire & Cas. Co.*, 157 Cal. App. 4th 1, 12 (2007) (rejecting victim's claim for abuse coverage under homeowner's policies issued years after alleged abuse ended for alleged bodily injury manifesting as emotional injury). Thus, Centennial's policies potentially cover the alleged emotional distress stemming from the alleged bodily injuries during its policy periods.

The Centennial policies define an "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." SUF 38. The Industrial policies define occurrence in this context as "an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period." SUF 18. Subject to coverage defenses not at issue in this motion, the Diocese's alleged negligent acts (including its conduct in hiring, supervising, and retaining clergy) in CCVA cases are the "occurrences" from its perspective if it did not expect or intend the conduct that gave rise to the injuries. *See Liberty Surplus Ins. Corp. v. Ledesma & Meyer Construction Co.*, 5 Cal. 5th 216, 229-30 (2018) (holding that bodily injury resulting from intentional act of the insured's employee was potentially caused by an "occurrence" from the perspective of the insured, when the insured was sued on

theories of negligent hiring, retention, or supervision of the employee). The CCVA claims allege potentially covered "bodily injury" during the Centennial policies' coverage periods, and they are potentially covered under the Centennial policies giving rise to a duty to defend under those policies.

Further, the Industrial policies "appl[y] to occurrences happening anywhere in the world ***during*** the policy period." SUF 20 (emphasis added); *see* SUF 18. This means that, to be covered by these policies, the "occurrence" that causes the "personal injury" must happen during the policy period, i.e., from June 18, 1981 through July 1, 1984. To the extent that either (i) a personal injury was caused by an occurrence predating this period or (ii) the Diocese exacerbated or failed to mitigate any alleged personal injury, the Industrial policies do not provide coverage.

For these reasons, Westchester has no duty to defend. *See Travelers Cas. & Sur. Co. v. Am. Int'l Surplus Lines Ins. Co.*, 465 F. Supp. 2d 1005, 1022 (S.D. Cal. 2006) ("The duty of an excess insurer to drop down never arises when the defense of the insured and the discharge of a particular judgment are within the coverage of a primary insurer … whose policy limits are not exhausted."). Rather, the "primary insurer owes the exclusive duty to defend." *Id.*

## V CONCLUSION

For the foregoing reasons, the Court should enter partial summary judgment in favor of Westchester and against the Diocese as to Westchester's first claim for relief (declaratory judgment) and the Diocese's first and second counterclaims (breach of contract and declaratory judgment, respectively) to the extent those counterclaims implicate the issue of whether Westchester owes a duty to drop down. For the same reasons, the Court should deny the Diocese's cross-motion for partial summary judgment.

Dated: September 22, 2025

**O'MELVENY & MYERS LLP**

By: */s/ Richard B. Goetz*
Richard B. Goetz
Zoheb Noorani

Dated: September 22, 2025

**CLYDE & CO US LLP**

By: */s/ Jason J. Chorley*
Alexander E. Potente
Jason J. Chorley

Attorneys for Plaintiff-Counterdefendant Westchester Fire Insurance Company as successor in interest to Industrial Underwriters Insurance Company

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Westchester Fire Insurance Company, certifies that this brief contains [6,456] words, which complies with the word limit of L.R. 11-6.1.

Dated: September 22, 2025

*/s/ Richard B. Goetz*
Richard B. Goetz

**ATTESTATION PER LOCAL RULE 5-4.3.4(a)(2)(i)**

The e-filing attorney hereby attests that concurrence in the filing of the document has been obtained from each of the other signatories indicated by a conformed signature (/s/) within this e-filed document.

Dated: September 22, 2025

**O'MELVENY & MYERS LLP**

By: */s/ Richard B. Goetz*
Richard B. Goetz
Zoheb Noorani

Attorneys for Plaintiff-Counterdefendant Westchester Fire Insurance Company as successor in interest to Industrial Underwriters Insurance Company