Richard B. Goetz (S.B. #115666)
*rgoetz@omm.com*
Zoheb Noorani (S.B. #253871)
*znoorani@omm.com*
**O'MELVENY & MYERS LLP**
400 South Hope Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

Alexander E. Potente (S.B. #208240)
*alex.potente@clydeco.us*
Jason J. Chorley (S.B. #263225)
*jason.chorley@clydeco.us*
**CLYDE & CO US LLP**
150 California Street, 15th Floor
San Francisco, California 94111
Telephone: (415) 365-9800
Facsimile: (415) 365-9801

Attorneys for Plaintiff-Counterdefendant Westchester Fire Insurance Company as successor in interest to Industrial Underwriters Insurance Company

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WESTCHESTER FIRE INSURANCE COMPANY, a Pennsylvania corporation,<br><br>Plaintiff,<br><br>v.<br><br>THE ROMAN CATHOLIC BISHOP OF ORANGE, a California corporation sole, and DOES 1 through 50,<br><br>Defendants. | Case No. 8:24-cv-01539-MRA(ADSx)<br><br>**WESTCHESTER FIRE INSURANCE COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ROMAN CATHOLIC BISHOP OF ORANGE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Accompanying Documents:**<br>Statement of Genuine Disputes; Proposed Order<br><br>Date: November 10, 2025<br>Time: 1:30 PM<br>Judge Mónica Ramírez Almadani<br>Courtroom 9B<br>Complaint Filed: July 11, 2024<br>Trial Date: None set |
| THE ROMAN CATHOLIC BISHOP OF ORANGE, a California corporation sole,<br><br>Counterclaimant,<br><br>v.<br><br>WESTCHESTER FIRE INSURANCE | |

COMPANY, a Pennsylvania corporation,

Counterdefendant.

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND SUMMARY OF ARGUMENT ............ 1

II. FACTUAL BACKGROUND ............ 2

III. LEGAL STANDARD ............ 2

IV. ARGUMENT ............ 2

A. The "Defense Settlement" Provision of the Industrial Policies Does Not Require Westchester to Defend. ............ 2

B. The "Coverage" and "Retained Limit—Limit of Liability" Provisions Do Not Require Westchester to Defend. ............ 10

V. CONCLUSION ............ 13

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. Explorer Ins. Co.*,
107 Cal. App. 4th 438 (2003) .......... 11

*Am. States Ins. Co. v. Ins. Co. of Pa.*,
800 F. App'x 452 (9th Cir. 2020) .......... 6

*Buss v. Superior Court*,
16 Cal. 4th 35 (1997) .......... 3, 5, 9

*Hartford Accident & Indem. Co. v. Superior Court*,
23 Cal. App. 4th 1774 (1994) .......... 10

*Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*,
61 Cal. 4th 988 (2015) .......... 3

*Legacy Vulcan Corp. v. Superior Court*,
185 Cal. App. 4th 677 (2010) .......... 6

*Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*,
5 Cal. 5th 216 (as modified July 25, 2018) .......... 2, 4, 5, 7

*Montgomery Ward & Co., Inc. v. Imperial Cas. & Indem. Co.*,
81 Cal. App. 4th 356 (2000) .......... 13

*Montrose Chem. Corp. of Cal. v. Superior Court*,
6 Cal. 4th 287 (1993) .......... 3, 5

*Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.*,
148 Cal. App. 4th 620 (2007) .......... 3, 6

*U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*,
2006 WL 1663437 (D. Ariz. June 12, 2006) .......... 13

*United Pac. Ins. Co. v. McGuire Co.*,
229 Cal. App. 3d 1560 (1991) .......... 8

*Wells Fargo Bank, N.A. v. Cal. Ins. Guarantee Ass'n*,
38 Cal. App. 4th 936 (1995) .......... 3, 6, 12, 13

*Whittaker Corp. v. Allianz Underwriters, Inc.*,
11 Cal. App. 4th 1236 (1992) .......... 3, 6

## I. INTRODUCTION AND SUMMARY OF ARGUMENT

Westchester, an excess-umbrella insurer to the Diocese, owes no present duty to defend the Diocese in pending CCVA suits because the Diocese has not yet exhausted the primary Centennial policies below Westchester. As Westchester's opening papers explained, it never agreed to drop down to provide a defense for occurrences covered by underlying insurance and the Diocese never paid Westchester premiums reflecting the risk of its being called on to do so. The Diocese now seeks to bypass its underlying policies and demands coverage from Westchester for one reason only: the Diocese's primary insurer, Centennial—which owes the defense and which in fact paid defense and indemnity when the Diocese faced a prior round of similar abuse suits—no longer exists and the Diocese has been unsuccessful in obtaining a defense from its other primary insurer. Nothing in the Diocese's moving papers expands Westchester's obligations.

The parties agreed to litigate "the drop-down duty to defend issue." Order, ECF No. 46, ¶¶ 1, 4. But the Diocese, perhaps recognizing that controlling California law definitively answers this question in Westchester's favor, now calls the drop-down issue a "red herring" and now argues that two other policy provisions trigger an "independent[]" duty to defend by Westchester. Diocese Br., ECF No. 85-1, at 1. Neither of the Diocese's arguments has merit, and the second, involving exhaustion, strays beyond the briefing order and raises issues that have not been developed given the partial stay the Court entered at the parties' request.

The Diocese first argues that the CCVA actions "potentially" fall outside the primary insurance policies' "occurrence" definition and thus, the Diocese claims, Westchester owes a defense under the Industrial policies' umbrella provision. But the Diocese does not even cite, and cannot counter, the Supreme Court of California's holding that a primary insurance policy containing the same definition of "occurrence" as the Diocese's primary policies ***did*** trigger the primary insurer's

duty to defend suits alleging the same claims and theories of liability as the CCVA actions. *See Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, 5 Cal. 5th 216, 220-21, 229-30 (as modified July 25, 2018). Second, the Diocese's argument that its 2005 settlement of abuse suits "exhausted" the limits of its primary policies ignores the plain terms of the Industrial policies and controlling precedent. It also raises issues that this Court cannot resolve on the present record.

## II. FACTUAL BACKGROUND

Westchester incorporates the facts recited in its memorandum in support of its motion for partial summary judgment. Westchester Br., ECF No. 84, at 2-10. The Diocese asserts that Westchester "has refused to defend any of the CCVA Claims." Decl. of B. Vincent ¶ 22, ECF No. 85-3. This is false. The Diocese has settled multiple CCVA claims over Westchester's objection. Westchester agreed to defend those claims in lieu of agreeing to settle, but the Diocese still settled over Westchester's objection. Westchester SUF 10, ECF No. 84-1 (citing Decl. of R. Zajac ¶ 10, ECF No. 84-2); *see* Statement of Genuine Disputes (filed concurrently). The Diocese's inaccurate assertion does not preclude entering partial summary judgment for Westchester.

## III. LEGAL STANDARD

Westchester incorporates the legal standard as described in its memorandum in support of its motion for partial summary judgment. Westchester Br. 10.

## IV. ARGUMENT

### A. The "Defense Settlement" Provision of the Industrial Policies Does Not Require Westchester to Defend.

Under California law and the Industrial policies, the Diocese's primary insurers—not Westchester—owe the Diocese a complete defense in the CCVA suits. Specifically:

- Westchester owes a defense only if an "occurrence" is (i) "not covered, as warranted, by the underlying policies listed in Schedule A hereof or not covered by any other underlying insurance collectible by the insured," and (ii) "covered by the terms and conditions of" the Industrial policies. Westchester SUF 25 (quoting Policy Stip., Ex. A at 031, § II).
- In the umbrella setting, "the term 'covered' is not ambiguous": "a claim is 'covered by underlying insurance' if it falls within the scope of coverage of that insurance, and is 'not covered by underlying insurance' if it falls outside the scope of insurance coverage." *Wells Fargo Bank, N.A. v. Cal. Ins. Guarantee Ass'n*, 38 Cal. App. 4th 936, 948-49 (1995).
- To assess whether a policy covers an "occurrence," courts look to "the underlying cause of the injury, rather than the injury or claim itself." *Whittaker Corp. v. Allianz Underwriters, Inc.*, 11 Cal. App. 4th 1236, 1241-42 (1992). This is called the "cause" test. *See Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.*, 148 Cal. App. 4th 620, 633-34 (2007).
- If a tort action potentially constitutes a covered "occurrence," the primary insurer owes a defense. *Montrose Chem. Corp. of Cal. v. Superior Court*, 6 Cal. 4th 287, 300 (1993) (duty arises unless suit "***can by no conceivable theory raise a single issue which could bring it within***" coverage).
- Once a primary insurer owes a defense, it must defend "complete[ly]"—meaning if "***any*** claims … are even potentially covered by the policy, [it] must provide its insured with a defense to ***all*** the claims." *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 991 (2015) (emphasis added); *see Buss v. Superior Court*, 16 Cal. 4th 35, 58-59 (1997).
- When a primary insurer owes the defense, the umbrella insurer does not—even if the primary insurer breaches its duty to defend. *See* Westchester Br. 18 (citing cases).

Under this established framework, the dispositive, threshold question is whether the Diocese's underlying policies potentially cover the CCVA claims. The answer to that question, in turn, hinges on whether the CCVA plaintiffs allege facts that constitute a potentially covered "occurrence" as defined in the underlying policies. Well-settled California law—and the Diocese's receipt of defense and indemnity coverage from Centennial for previous abuse suits—leaves no doubt: the answer to each question is yes. Thus, the Diocese's primary insurers owe the Diocese a complete defense, and Westchester does not.

The CCVA plaintiffs allege that the Diocese's negligent supervision, retention, and hiring caused the abuse they suffered. *See* JCCP Compl., Ex. D to Zajac Decl., ECF No. 84-3, ¶¶ 46, 49, 51-52, 77-113. This alleged negligence constitutes a potentially covered "occurrence" under California law. The Supreme Court of California's decision in *Ledesma*, 5 Cal. 5th 216—which the Diocese nowhere cites—is on all fours. There, the court rejected the primary insurer's argument that a minor's sexual abuse by an employee whom the insured allegedly negligently supervised, retained, and hired did not constitute an "occurrence" under the employer's policy. Thus, the court held, the primary insurer had a duty to defend the employer, even though the perpetrator could not receive coverage for intentional acts. *Id.* at 220-21, 229-30. The primary insurer's policy provided coverage for an "occurrence," which—like the underlying policies here—was defined as an "accident." *Id.* at 220 & n.2.[1] "[T]he word 'accident'" in this context "refers to the ***conduct of the insured***" and is "more comprehensive than the term 'negligence'"; thus, the policy "promises coverage for liability resulting from the

[1] Specifically, the Centennial policies define "occurrence" as "an accident" that "results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Westchester SUF 38 (quoting Policy Stip., Ex. B at 091, 156).

***insured's*** negligent acts." *Id.* at 221-22 (emphasis original; internal alterations and quotations omitted). Applying these principles, the court concluded that the term "accident" included alleged negligent hiring, retention, and supervision. *Id.* at 229-30. As the court explained, "the 'occurrence resulting in injury' began with [the employer]'s negligence and ended with [the employee]'s act of molestation." *Id.* at 225 (quotations omitted). The court rebuffed the primary insurer's argument that the "alleged negligent hiring merely created the potential for injury but was not itself the cause of the injury." *Id.* at 227 (internal alterations and quotations omitted).

Under *Ledesma*, the CCVA plaintiffs allege negligence by the Diocese that potentially falls within the underlying policies' definition of "occurrence," implicating the primary insurers' duty to defend. They "must defend entirely," and "cannot parse the claims, dividing those that are at least potentially covered from those that are not." *Buss*, 16 Cal. 4th at 49.

Indeed, by both word and deed the Diocese has conceded this dispositive point. In 2005, the Diocese sought—and received—a complete defense and indemnity from Centennial for nearly identical abuse claims. Westchester SUF 7; Diocese SUF 23-26. And even now, the Diocese concedes that "some aspects of the CCVA Claims might trigger a defense under the underlying coverage." Diocese Br. 9. That resolves this issue. As further explained below, it makes no difference whether only some claims, alleged injuries and damages, or requests for relief are covered by the underlying policies. Nor does it matter whether the Diocese's primary insurers have actually defended the Diocese.

Indeed, errors infect each step of the Diocese's contrary argument:

***"Potential" primary coverage.*** At the outset, the Diocese gets the wrong answer because it asks the wrong question. As explained, the dispositive issue is whether there is a "bare 'potential' or 'possibility'" that the underlying policies

cover the CCVA actions. *Montrose*, 6 Cal. 4th at 300; *see Ledesma*, 5 Cal. 5th at 222. The Diocese poses the opposite question: whether the CCVA actions "potentially fall[] outside the scope of the underlying coverage." Diocese Br. 5-6; *see id.* at 9-10 (similar). This turns established California law on its head, replacing the settled rule that an umbrella insurer owes no duty to defend when the underlying policy ***potentially provides*** coverage with its mirror opposite. Under the Diocese's upside-down approach, the umbrella insurer owes a freestanding duty to defend if the underlying policy merely ***potentially does not provide*** coverage.

None of the cases the Dioceses cites supports its remarkable assertion. Its reliance on *Legacy Vulcan Corp. v. Superior Court*, 185 Cal. App. 4th 677 (2010), is misplaced because that case did not involve the issue in dispute here: whether the underlying tort actions triggered the primary insurer's duty to defend. The other case the Diocese cites, *Am. States Ins. Co. v. Ins. Co. of Pa.*, 800 F. App'x 452 (9th Cir. 2020), provides no guidance because it involved materially different policy language. There, the underlying insurer's policy expressly limited its duty to defend to vicarious liability. *Id.* at 454. The underlying suits in that case were not limited to a vicarious liability theory, "creating a gap in the scope of [the underlying insurer's] defense obligation" that the umbrella insurer had to fill. *Id.* By contrast, the underlying policies here have no similar limitation, so the Industrial policies' umbrella provision does not come into play. *See Wells Fargo*, 38 Cal. App. 4th at 948 (umbrella clause "comes into play only if the occurrence is 'not covered' by the [underlying] policy"; because underlying policy "clearly does 'cover' the underlying" lawsuit, "the excess clause, not the umbrella clause, controls the relationship" between policies).

***"Occurrence."*** In arguing that the CCVA suits "potentially" fall outside the underlying policies' "occurrence" definition, the Diocese disregards California's "cause" test for occurrences. *See Whittaker*, 11 Cal. App. 4th at 1242; *Safeco*, 148

Cal. App. 4th at 633-34. Instead, the Diocese insists that the Industrial policies are broader than the underlying policies because, according to the Diocese, the Industrial policies (i) "extend[] to intentional acts" and (ii) "encompass[] emotional and psychological occurrences." Diocese Br. 6-9. The same flaw dooms each theory: the Diocese misapprehends the meaning of "occurrence" under California law as it relates to the CCVA actions.

Start with the Diocese's "intentional acts" theory. The Diocese stresses that the definition of "personal injury" in the Industrial policies includes "assault and battery not committed by or at the direction of the insured" and "invasion of the rights of privacy." Diocese Br. 6. That is of no consequence because the alleged abusive conduct is not itself the occurrence, but the effect of an occurrence. As *Ledesma* makes clear, it is the Diocese's conduct—its alleged negligent supervision, hiring, and retention—that is at issue. *See* 5 Cal. 5th at 221-22. Here, the Diocese's alleged negligence potentially falls within the underlying policies' "occurrence" definition, thus triggering the primary insurers' defense obligation. *See id.* at 225 ("[T]he 'occurrence resulting in injury' began with [the employer]'s negligence and ended with [the employee]'s act of molestation." (quotations omitted)). Indeed, the Industrial policies are no broader than the Centennial policies in any relevant way. Consider the "occurrence" definition in each:

| Industrial Policies | Centennial Policies |
|---|---|
| With respect to Coverage 1(a) and 1(b) "occurrence" means either an accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. | "occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured; |
| Westchester SUF 18; Policy Stip., Ex. A at 032. | Westchester SUF 38; Policy Stip., Ex. B at 091, 156. |

Each set of policies excludes injuries that are expected or intended. And the "happening or event" language in the Industrial policies is irrelevant; as *Ledesma* concluded, the presence of the term "accident" in the Centennial policies gives rise to the duty to defend the CCVA plaintiffs' claims for abuse, grooming, and invasions of privacy resulting from the Diocese's alleged negligent supervision, retention, and hiring. *Supra* at 4-5. None of the cases the Diocese cites, *see* Diocese Br. 7, supports the notion that the term "accident" excludes the negligent supervision, retention, and hiring alleged in the CCVA actions.[2]

The Diocese's "emotional and psychological occurrences" theory fares no better. Under the governing cause test, none of the alleged ***harms*** the Diocese points to—such as emotional distress, anxiety, and depression—constitutes an "occurrence." These, too, are the effects of an occurrence; it is the Diocese's alleged negligence that the CCVA plaintiffs assert allowed the abusive conduct to occur and caused their injuries. Thus, the CCVA suits allege facts that potentially fall within the "occurrence" definition and trigger the underlying insurers' defense obligation. Under *Ledesma* and *Buss*, the underlying insurers owe the Diocese a complete defense. It does not matter whether some alleged ***damages*** from an occurrence are not covered by the underlying policies. *Supra* at 3.

Regardless, this theory fails on the facts. The Diocese conspicuously fails to assert that even a single CCVA plaintiff alleges solely non-physical injuries—all three examples it cites allege appalling acts of physical abuse.[3] That is unsurprising,

---

[2] The only California decision the Diocese cites, *United Pac. Ins. Co. v. McGuire Co.*, 229 Cal. App. 3d 1560 (1991), predates *Ledesma* by nearly two decades and involved a wrongful-termination claim, not alleged negligent supervision, retention, or hiring.

[3] Plaintiff 178 alleges the perpetrator "fondl[ed] Plaintiff's genitals," "fondl[ed] Plaintiff's body," "remov[ed] Plaintiff's clothes," and "[blew] air with his mouth on the Plaintiff's genitals." Diocese SUF 10. Plaintiff 557 alleges the perpetrator "sexually assault[ed], abuse[d], and molest[ed] Plaintiff," including by

because California law does not recognize claims for emotional distress untethered from bodily injury. *See* Westchester Br. 10.

***Westchester's "expected or intended" assertion.*** Finally, Westchester's assertion in this litigation that the CCVA claims do not constitute an "occurrence" under the Industrial policies because they do not involve "unexpected and unintentional conduct," Diocese Br. 9, lends the Diocese no support. Were Westchester to establish that the Diocese expected the abuse to occur, it would mean that neither Westchester nor the primary insurers have any duty to indemnify the Diocese. But that issue remains in dispute, has been stayed, and until it is resolved does not abrogate the underlying insurers' defense obligation. *See Buss*, 16 Cal. 4th at 46. What matters for present purposes is that the CCVA suits potentially fall within the underlying policies' "occurrence" definition, as they allege the Diocese engaged in negligent hiring, supervision, and retention of employees who engaged in abuse. Thus, the underlying insurers owe the duty to defend until determined otherwise.

* * *

In short, the CCVA actions allege that the Diocese's negligence in hiring, supervising, and retaining clergy and other employees resulted in rampant sexual abuse of minors; these negligence claims potentially fall within the underlying policies' "occurrence" definition; thus, the underlying insurers, rather than Westchester, owe the duty to defend the CCVA actions completely; and the underlying insurers' failure to do so does not shift that duty to Westchester.

---

"performing oral sex on Plaintiff" and "fondling Plaintiff's penis." Diocese SUF 11. Plaintiff 1832 alleges the perpetrator "fondled Plaintiff's penis and testicles … no less than twenty times." Diocese SUF 12.

### B. The "Coverage" and "Retained Limit—Limit of Liability" Provisions Do Not Require Westchester to Defend.

As a last-ditch argument, the Diocese argues that Westchester must pay defense costs as part of its excess coverage on the ground that the Diocese's settlement of an earlier round of abuse suits in 2005 satisfied any "retained limit" obligation the Diocese had. Diocese Br. 10-15. The Diocese's argument fails for at least two reasons.

First, the underlying policies have ***per-occurrence limits*** with ***no aggregate limit***. This means that the Diocese, and its underlying insurers, must pay the occurrence limit for each occurrence. Westchester SUF 3-4 (citing, e.g., Policy Stip., Ex. A at 009-010, 018; Ex. B at 085). Thus, to prevail on the theory that its prior settlement exhausted the limits in the underlying policies, the Diocese would have to successfully argue that the full range of its alleged conduct involving numerous employees and hundreds of abuse claims—including both the CCVA claims as well as the claims the Diocese settled in 2005—constituted but ***a single*** occurrence. The Diocese does not even expressly advance that contention, so the Court need not address this inchoate argument. Indeed, because the Diocese has not sought (much less obtained) a judicial ruling on the number of occurrences, it lacks a necessary predicate to support this argument. When a dispute exists about the number of occurrences, the primary insurer must continue to defend until the issue is resolved. *See Hartford Accident & Indem. Co. v. Superior Court*, 23 Cal. App. 4th 1774, 1781-82 (1994) (primary insurer asserting exhaustion based on number of occurrences must continue to defend until it obtains judicial judgment on issue). Nor could the Diocese obtain such a ruling on the present record.[4] In any event, if

---

[4] The exhaustion issue is not fully developed because the Court directed the parties to address "the drop-down duty to defend issue" in cross-motions and, at the parties' request, stayed the balance of the case. Order, ECF No. 46. The Diocese itself concedes that its exhaustion argument strays well beyond the briefing order, as

the Diocese established that only one occurrence is at issue, then Westchester too would owe only one occurrence limit for all of the abuse claims against the Diocese. The Court would then need to address whether Westchester's limits were also exhausted by the 2005 settlement.

Seemingly in an effort to get around this problem, the Diocese cites out-of-state cases to argue that, in determining the limits of underlying policies in the exhaustion context, courts look only at "the dollar amounts specified" for underlying policies listed in the schedule appended to the excess policy. Diocese Br. 11-12. Further, the Diocese says, Endorsement 5 to the Industrial policies sets "a total of $1.5 million in scheduled limits" that it has already paid as part of the 2005 settlement, such that it has exhausted the primary limits. *Id.* at 13 (citing Policy Stip., Ex. A at 016). The endorsement cannot bear the weight the Diocese puts on it. "Standing alone, an endorsement means nothing"; instead, "the policy of insurance with the endorsements and riders thereon must be construed as a whole." *Adams v. Explorer Ins. Co.*, 107 Cal. App. 4th 438, 451 (2003) (quotations omitted). Here, as to the Centennial policies, the schedule of underlying policies for each year specifies a $500,000 limit next to "Each Occurrence" and a separate $500,000 limit next to "Aggregate when applicable." Policy Stip., Ex. A at 010 (1981-1982); *id.* at 009 (1983-1984); *id.* at 018 (1982-1983).[5] Notably, the certificates of renewal for 1982-1983 and 1983-1984—which postdate Endorsement 5—incorporate those limits. *Id.* at 006-07. The only effect of Endorsement 5 is a modest one: the Industrial

---

it seeks to establish an "independent[]" duty to pay defense costs that is "separate and distinct from [Westchester's] 'drop down' duty to defend obligation." Diocese Br. 10 n.16.

[5] The Centennial policies contain an endorsement setting an aggregate limit for bodily injury "included within the Products Hazard" or "included in the Completed Operations Hazard," Policy Stip., Ex. B at 085, but the CCVA plaintiffs do not allege bodily injury that implicates either the Products Hazard or the Completed Operations Hazard, *id.* at 091.

policies' original schedule listed one Aetna primary policy spanning from June 18 to July 1, 1981, but did not list a second Aetna primary policy spanning from July 1 to July 21, 1981, and omitted policy numbers for all of the listed policies, *id.* at 010, so an endorsement was needed to add this information.

Second, the Diocese's argument cannot be squared with the very provisions it relies on. The Diocese grounds its demand for defense costs in the Industrial policies' "Coverage" provision, under which Westchester "agrees to pay on behalf of the insured the ultimate net loss in excess of the retained limit hereinafter stated" for a covered occurrence. Westchester SUF 17 (citing Policy Stip., Ex. A at 031, § I); *see* Diocese Br. 11. The "Retained Limit—Limit of Liability" provision, which the Diocese also relies on, likewise refers to the "ultimate net loss in excess of the insured's retained limit." Westchester SUF 23 (citing Policy Stip., Ex. A at 033, § V). In turn, the definition of "Ultimate Net Loss" contains a standalone, bolded paragraph stating: "**This policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance**." Westchester SUF 21 (citing Policy Stip., Ex. A at 032, § III(5)). Accepting the Diocese's argument would read this paragraph out of existence.

The Diocese asserts in passing that the unequivocal language in the Ultimate Net Loss paragraph merely prevents "redundan[t]" payments from an excess insurer for "defense costs which have already been paid by other underlying insurers." Diocese Br. 14. Not so. For one thing, this paragraph contains no such limitation on its effect. For another, the Diocese's argument ignores *Wells Fargo*, which held that the term "covered by" unambiguously "refer[s] to the ***scope*** of the underlying insurance," not what is or can be collected. 38 Cal. App. 4th at 948 (emphasis original). As that decision explained, "a layperson would understand that a claim is

'covered by underlying insurance' if it falls within the scope of coverage of that insurance." *Id.* at 948-49.[6]

## V. CONCLUSION

For the reasons above and as explained in Westchester's opening papers in support of its motion for partial summary judgment, the Court should deny the Diocese's motion for partial summary judgment and enter partial summary judgment in favor of Westchester.

Dated: October 13, 2025 **O'MELVENY & MYERS LLP**

By: */s/ Richard B. Goetz*
Richard B. Goetz
Zoheb Noorani

Dated: October 13, 2025 **CLYDE & CO US LLP**

By: */s/ Jason J. Chorley*
Alexander E. Potente
Jason J. Chorley

Attorneys for Plaintiff-Counterdefendant Westchester Fire Insurance Company as successor in interest to Industrial Underwriters Insurance Company

---

[6] Neither of the cases the Diocese cites regarding the Ultimate Net Loss paragraph is on point. *See* Diocese Br. 14. One decision, *U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 2006 WL 1663437, at *5 (D. Ariz. June 12, 2006), applied Arizona law and thus did not address *Wells Fargo*'s holding that the phrase "covered by" refers to the scope of coverage of an underlying policy, not what is actually paid by the underlying policy. The other, *Montgomery Ward & Co., Inc. v. Imperial Cas. & Indem. Co.*, 81 Cal. App. 4th 356, 375 (2000), did not interpret the language at issue at all, but instead a separate clause added to the paragraph via an endorsement.

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Westchester Fire Insurance Company, certifies that this brief contains 3,953 words, which complies with the word limit of L.R. 11-6.1.

Dated: October 13, 2025

*/s/ Richard B. Goetz*
Richard B. Goetz

**ATTESTATION PER LOCAL RULE 5-4.3.4(a)(2)(i)**

The e-filing attorney hereby attests that concurrence in the filing of the document has been obtained from each of the other signatories indicated by a conformed signature (/s/) within this e-filed document.

Dated: October 13, 2025

**O'MELVENY & MYERS LLP**

By: */s/ Richard B. Goetz*
Richard B. Goetz
Zoheb Noorani

Attorneys for Plaintiff-Counterdefendant Westchester Fire Insurance Company as successor in interest to Industrial Underwriters Insurance Company