Brent W. Vincent (*pro hac vice*)
brent.vincent@Lathropgpm.com
LATHROP GPM LLP
155 North Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: 312.920.3300
Facsimile: 312.920.3301

Attorney for Defendant/Counterclaim Plaintiff The Roman Catholic Bishop of Orange
*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| WESTCHESTER FIRE INSURANCE COMPANY, a Pennsylvania corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE ROMAN CATHOLIC BISHOP OF ORANGE, a California Corporation Sole, and DOES 1 through 50,<br><br>Defendants. | Case No. 8:24-cv-01539-MRA (ADSx)<br><br>**RCBO'S RESPONSE IN OPPOSITION TO WESTCHESTER FIRE INSURANCE COMPANY'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DUTY TO DEFEND** |
| THE ROMAN CATHOLIC BISHOP OF ORANGE, a California Corporation Sole,<br><br>Counterclaim Plaintiff,<br><br>vs.<br><br>WESTCHESTER FIRE INSURANCE COMPANY, a Pennsylvania corporation,<br><br>Counterclaim Defendant. | Motion Hearing: November 10, 2025, 1:30 p.m.<br>Hon. Mónica Ramírez Almadani<br>Action filed: July 11, 2024<br>Fact discovery deadline: July 8, 2025<br>Pretrial conference date: TBD<br>Trial date: TBD |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..... 1

ARGUMENT ..... 2

- I. Primary Umbrella Coverage. ..... 2
  - A. The phrase "any occurrence not covered" refers to indemnity, not defense, coverage. ..... 3
  - B. RCBO has met its minimal burden to show primary umbrella coverage. ..... 5
  - C. Even under Westchester's misreading, it still owes a duty to defend. ..... 8
  - D. Westchester's Motion as respects primary umbrella coverage must be denied. ..... 9
- II. Ultimate Net Loss Coverage. ..... 9
  - A. The Umbrella Policies contain three separate duty-to-defend grants. ..... 10
  - B. "Ultimate Net Loss" indemnity coverage is separate from any duty to defend. ..... 12
  - C. RCBO's retained limit obligation is capped at $1.5 million—no more. ..... 13
  - D. The Umbrella Policies do not "disclaim a defense." ..... 15
  - E. Summary. ..... 16

CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. States Ins. Co. v. Ins. Co. of Pa.*,
800 Fed. App'x 452 (9th Cir. 2020) .......... 4, 9

*Bjork v. State Farm Fire & Cas. Co.*,
157 Cal. App. 4th 1 (2007) .......... 7

*Buss v. Superior Ct.*,
16 Cal. 4th 35 (1997) .......... 8

*Certain Underwriters at Lloyd's London v. Columbia Cas. Co.*,
Case No. 23-cv-02157-AJB-DDL, 2025 WL 1287727 (S.D. Cal. May 2, 2025) .......... 9

*Deere & Co. v. Allstate Ins. Co.*,
32 Cal. App. 5th 499 (2019) .......... 4

*J.C. Penney Cas. Ins. Co. v. M.K.*,
52 Cal. 3d 1009 (1991) .......... 7

*Legacy Vulcan Corp. v. Superior Ct.*,
185 Cal. App. 4th 677 (2010) .......... *passim*

*NW Pipe Co. v. RLI Ins. Co.*,
734 F. Supp. 2d 1122 (D. Or. 2010) .......... 5, 9, 17

*Republic W. Ins. Co. v. Fireman's Fund Ins. Co.*,
241 F. Supp. 2d 1090 (N.D. Cal. 2003) .......... 4

*Sempra Energy v. Associated Elec. & Gas Ins. Servs., Ltd*,
772 F. Supp. 3d 1148 (C.D. Cal. 2025) .......... 13

*Span, Inc. v. Associated Int'l Ins. Co.*,
227 Cal. App. 3d 463 (1991) .......... 11, 12

*State Ins. Fund v. Int'l Ins. Co.*,
251 A.D.2d 86 (N.Y. App. Div. 1998) .......... 13, 14

*Ticor Title Ins. Co. v. Emp'rs. Ins. of Wausau*,
40 Cal. App. 4th 1699 (1995) .......... 4

*U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, Case No. CV 04-0662 PHX-DGC, 2006 WL 1663437 (D. Ariz. June 12, 2006) .......... 16

*United Pac. Ins. Co. v. McGuire Co.*, 229 Cal. App. 3d 1560 (1991) .......... 6, 7

*Wells Fargo Bank v. Cal. Ins. Guarantee Ass'n.*, 38 Cal. App. 4th 936 (1995) .......... 4

*Westport Ins. Corp. v. Cal. Cas. Mgmt. Co.*, 249 F. Supp. 3d 1164 (N.D. Cal. 2017) .......... 7

## STATUTES

California Child Victims Act, A.B. 218, California Civil Procedure § 340.1 .......... *passim*

Defendant/Counterclaimant The Roman Catholic Bishop of Orange ("RCBO") submits this Memorandum in Opposition to Westchester Fire Insurance Company's ("Westchester") Motion for Summary Judgment and Memorandum of Points and Authorities in Support (Westchester's "Motion," ECF No. 84).

**INTRODUCTION**

RCBO purchased from Industrial (Westchester's predecessor) ***primary umbrella coverage***—that is, "additional primary coverage"[1]—specifically to protect against "*any occurrence not covered*" by the commercial general liability ("CGL)" policies listed as underlying insurance. Whereas the CGL policies insure only "bodily injury" caused by "accidents," the Umbrella Policies[2] extend much further, expressly covering:

- Physical or nonphysical abuse by clergy members ("assault and battery not committed by or at the direction of the insured");
- Grooming, exploitation, and violations of the parishioners' rights to seclusion and dignity ("invasion of the rights of privacy"); and
- Emotional and psychological harms, including "shock, mental anguish and mental injury."

The ongoing childhood abuse lawsuits brought under the California Child Victims Act ("CCVA Claims") plainly fall within this expanded umbrella coverage. The claims allege—and seek damages for—occurrences expressly included in the Umbrella Policies but outside the limited accident-only scope of the CGLs. Indeed,

---

[1] *See* Westchester's Motion at p. 4 ("An umbrella policy may provide additional primary coverage*, i.e.* broader coverage than contained in the primary policy.") (citation omitted).

[2] The "Umbrella Policies" are the three commercial umbrella policies issued by Industrial Underwriters Insurance Company ("Industrial") to RCBO effective June 18, 1981, through July 1, 1984. The underlying CGL policies were issued by Aetna Casualty and Surety Company ("Aetna") from June 18, 1981, to July 21, 1981, and Centennial Insurance Company ("Centennial") from July 21, 1981, to July 1, 1984. *See* Stipulation Regarding Policies ("Policy Stip"), ECF No. 81.

Westchester itself argues that the CCVA Claims do not constitute "accidents" under the CGL policies because they "do not arise from unexpected and unintentional conduct."[3]

Under California's ordinary duty-to-defend principles—which apply equally to primary umbrella insurance (*Legacy Vulcan Corp. v. Superior Ct.*, 185 Cal. App. 4th 677, 692 (2010)) – Westchester owed RCBO a ***primary duty to defend*** the CCVA Claims. Its refusal to do so is a breach of contract.

Separately—and as established in RCBO's Opening Brief[4]—Westchester also owes an ***indemnity*** obligation to immediately pay defense costs under the Umbrella Policies' "ultimate net loss" provision. RCBO has undisputedly satisfied its retained-limit obligation, triggering that duty as a matter of contract.

For either independent reason, Westchester's Motion must be denied.

## ARGUMENT

### I. Primary Umbrella Coverage.

Westchester concedes the critical premises that govern this dispute:

- Section II ("Defense Settlement") of the Umbrella Policies provides ***primary coverage***; it is not contingent upon exhaustion or collectability of underlying limits.
- This coverage applies whenever an "occurrence" is within the Umbrella's scope but outside the scope of the CGLs.
- Centennial's insolvency has no bearing on Westchester's duty to defend.

Having conceded these fundamentals, Westchester's Motion rests entirely on a single, untenable proposition: that the phrase *"[w]ith respect to any occurrence not*

---

[3] *See* Westchester's Answers to RCBO's Interrogatories (Set One), Response to Interrogatory No. 5, attached to the Declaration of Brent Vincent (ECF No. 85-3) at p. 104 of 110 ("Westchester contends that the CCVA claims do not arise from unexpected and unintentional conduct, and therefore do not constitute an 'occurrence' under the Industrial Excess Policies.").

[4] RCBO's "Opening Brief" refers to its Memorandum in Support of its Motion for Partial Summary Judgment on the Duty to Defend, ECF No. 85-1.

*covered … by the underlying policies"* refers to the scope of ***defense coverage*** rather than ***indemnity coverage*** under the underlying CGLs. That reading is irreconcilable with the policy text, the structure of Section II, and controlling precedent.

**A. The phrase "any occurrence not covered" refers to indemnity, not defense, coverage.**

Section II ("Defense Settlement") provides:

> *With respect to any occurrence not covered* … by the underlying policies listed in Schedule A … but covered by the terms and conditions of this policy … the company shall: (a) defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent….

*See* Policy Stip. (ECF No. 85-1), Ex. A (Industrial Policies) at 031. When read in context, the phrase "*any occurrence not covered*" can only refer to ***indemnity coverage.*** The following features of the clause confirm this:

- **Coverage precedes defense.** The clause first describes the coverage scenario—an occurrence not indemnified by the CGLs but indemnified by the umbrella—and ***then*** imposes a defense duty for "any suit" alleging such injury. Reading "covered" to mean "defended" renders the sentence circular nonsense: *"With respect to any occurrence not defended by the underlying … but defended by this policy … the company shall defend."* The text cannot reasonably be read that way.
- **Structure and logic.** The duty to defend attaches to suits "alleging such injury … and seeking damages," mirroring the well-settled rule that the duty to defend arises whenever there is ***potential for indemnity coverage***. The Umbrella adopts that same logical sequence: potential for indemnity potential first, defense second.
- **Plain text.** The phrase is "*any occurrence not covered*"—not "*any suit not defended.*"[5] Westchester's reading deletes words the parties chose

[5] One of Westchester's own citations supports this point. *See* Westchester's Motion

and inserts words they did not. Courts do not permit such rewriting.

Further, Westchester cites no authority adopting its reading.[6] None exists. The cases addressing this language uniformly confirm that "not covered" refers to ***indemnity,*** not defense:

- ***Legacy Vulcan***, 185 Cal. App. 4th at 690–93 – The California Court of Appeal interpreted materially identical umbrella language ("not within the terms of the coverage of underlying insurance") and held that it referred to the scope of indemnity coverage, not defense. Thus, the umbrella insurer had a primary duty to defend "if any claim was potentially covered by its policy but was not within the terms of coverage of 'underlying insurance.'" *Id.* at 693.
- ***Am. States Ins. Co. v. Ins. Co. of Pa.***, 800 Fed. App'x 452, 454 (9th Cir. 2020) – The Ninth Circuit likewise construed the phrase "covered by the [umbrella] Policy but not covered by any underlying insurance" as referring to indemnity coverage. Because the underlying lawsuit sought damages outside the scope of the primary insurance, the umbrella

---

p. 18 (citing *Ticor Title Ins. Co. v. Emp'rs. Ins. of Wausau*, 40 Cal. App. 4th 1699, 1706–07 (1995)), which construed a clause that explicitly tied the umbrella defense obligation to the absence of "defense coverage" in the underlying policy: *"With respect to any claim or suit … for which no defense coverage is provided by underlying insurance …"* (emphasis added). That language shows insurers know how to draft defense-contingent provisions. Westchester's Umbrella Policies omit such wording.

[6] The cases Westchester relies on are inapposite because they involved "following form" umbrella policies, not independent primary umbrella grants. In *Wells Fargo Bank v. Cal. Ins. Guarantee Ass'n.*, 38 Cal. App. 4th 936, 940 (1995), for example, the umbrella policy simply incorporated the CGL's terms wholesale, so there was no difference in scope between the two layers. The same is true of *Deere & Co. v. Allstate Ins. Co.*, 32 Cal. App. 5th 499, 514 (2019) (following form); *Ticor Title*, 40 Cal. App. 4th at 1700–01 (umbrella and primary coverage were "identical"); and *Republic W. Ins. Co. v. Fireman's Fund Ins. Co.*, 241 F. Supp. 2d 1090, 1098 (N.D. Cal. 2003) (same). By contrast, the Westchester Umbrella Policies provide their own broader coverage grant, not merely a carbon copy of the CGLs.

carrier had a "co-primary" duty to defend.

- ***NW Pipe Co. v. RLI Ins. Co.***, 734 F. Supp. 2d 1122, 1129 (D. Or. 2010) – Construing identical "any occurrence not covered by underlying" wording, the court confirmed the phrase refers to the scope of indemnity coverage, not defense coverage. As the court explained, "RLI's policy clearly defines its duty to defend in terms of an occurrence covered by underlying insurance. An occurrence is defined in terms of an event triggering indemnification rather than defense."

In short, the phrase "*any occurrence not covered*" describes the scope of ***indemnity coverage***—not the absence of defense coverage. Westchester's interpretation rewrites both grammar and precedent to achieve a result its policy language cannot support.

### B. RCBO has met its minimal burden to show primary umbrella coverage.

As shown in RCBO's Opening Brief, Section II's duty to defend is governed by the ordinary rules applicable to primary liability coverage. *Legacy Vulcan*, 185 Cal. App. 4th at 692-93. The insured need only show a ***potential*** for coverage; the insurer must defend unless it can ***conclusively negate*** that potential. Any doubt is resolved in favor of the insured. *Id*.

RCBO has met this minimal burden. The CCVA Claims allege occurrences within the Umbrella's indemnity grant but outside the CGLs' narrow coverage. Westchester—who bears the burden of disproving potential coverage—has not come close. As detailed in RCBO's Opening Brief in support of its Motion for Summary Judgment:

- **Different occurrence definitions create a coverage gap.** The CGLs define "occurrence" only as an "accident," whereas the Umbrella extend coverage to a "happening or event." California courts have long recognized this distinction as outcome-determinative: accident-only

policies exclude intentional acts, but "happening" or "event" language encompasses them so long as any resulting harm was unintended by the insured. *See United Pac. Ins. Co. v. McGuire Co.*, 229 Cal. App. 3d 1560, 1564–65 (1991). The CCVA Claims—alleging assaults and related misconduct not committed by or at RCBO's direction—fit squarely within the Umbrella's broader definition and potentially outside the CGLs' narrower one.

- **Different injury definitions widen the gap.** The CGLs cover only "bodily injury" (physical harm), while the Umbrella extends to "shock, mental anguish and mental injury" and "invasion of the rights of privacy." The CCVA Claims allege these very harms—grooming, harassment, exploitation, humiliation, loss of dignity—placing them within the Umbrella's personal injury coverage and outside the CGLs' narrow scope.
- **Westchester's own position confirms the gap.** Westchester asserts the CCVA Claims are not "accidents." That admission concedes the CCVA Claims potentially fall outside the CGLs' narrow definition of "occurrence"—and simultaneously triggers the Umbrella's broader coverage.

RCBO has thus met its minimal burden. Westchester has not come close to negating potential coverage.[7] Its duty to defend follows as a matter of law.

---

[7] The Court should not be misled by the final three pages of Westchester's Motion (pp. 18-20). What is presented as an "***[i]n any event***" argument (p. 18) is neither a genuine dispute over RCBO's need for a minimal showing of potential coverage nor a serious attempt to carry Westchester's burden of negating *all* facts suggesting coverage. Instead, it is a cascade of shifting, inconsistent assertions—each resting on a faulty premise. A few examples illustrate the point:

- **"The alleged 'occurrence' is negligent supervision, hiring, and retention … which would also constitute assault and battery"** (Motion p. 18). There is no authority for redefining "occurrence" in this manner. It contradicts the language of the Umbrella Policies and has

been rejected by California courts. *See Westport Ins. Corp. v. Cal. Cas. Mgmt. Co.*, 249 F. Supp. 3d 1164, 1179 (N.D. Cal. 2017) (separate injuries to each child constituted separate "occurrences" within each policy period).

- **"Both policies cover emotional distress caused by bodily injury and both require an accident …"** (Motion p. 19). False. The CGLs define "occurrence" only as an "accident"; the Umbrella Policies extend the definition to "happenings" and "events." *Compare* Policy Stip., Ex. B (Centennial Policies) at 094 *with* Policy Stip, Ex. A (Industrial Policies) at 032. California courts recognize this distinction is outcome-determinative: "accident-only" policies exclude intentional acts, while "event" or "happening" language does not. *United Pac. Ins. Co.* 229 Cal. App. 3d at 1564–65.
- **"Bodily injury is inherent in abuse …"** (Motion p. 19, citing *J.C. Penney Cas. Ins. Co. v. M.K.*, 52 Cal. 3d 1009 (1991)). A misreading. *J.C. Penney* held only that Ins. Code § 533 bars indemnification of child molesters. It did not hold that abuse always equates to "bodily injury," nor that dignitary or emotional harms are excluded. The CCVA Claims allege grooming, exploitation, and invasion of privacy—harms plainly outside the CGL's bodily-injury-only scope but inside umbrella coverage.
- **"California law does not recognize … emotional distress untethered to bodily injury"** (Motion p. 19, citing *Bjork v. State Farm Fire & Cas. Co.*, 157 Cal. App. 4th 1 (2007)). Incorrect and unsupported by *Bjork*. California law recognizes numerous stand-alone torts untethered to physical injury—including IIED, sexual harassment, breach of fiduciary duty, and human trafficking—all expressly alleged in the CCVA Claims.
- **"Subject to coverage defenses not at issue in this motion …"** (Motion p. 19). Westchester identifies none. This is hand-waving, not legal analysis.
- **"To the extent that … the Diocese exacerbated or failed to mitigate any alleged personal injury, the Industrial policies do not provide coverage** (Motion p. 20). Again, no citation, no policy language, no authority. Another unsupported assertion offered without analysis.

In short, these pages are not a coherent defense of Westchester's position. They are a series of unmoored statements, contradicted by the policy language and controlling precedent, that do nothing to negate RCBO's showing of potential coverage or relieve Westchester of its clear duty to defend.

### C. Even under Westchester's misreading, it still owes a duty to defend.

Even if the Court accepted Westchester's flawed premise—that "*not covered by underlying policies*" refers to the scope of defense coverage rather than indemnity coverage—Westchester would still owe a duty to defend. The reason is straightforward: as applied to the CCVA Claims, the Umbrella Policies plainly provide broader (or at least potentially broader) defense coverage than the underlying CGLs.

Westchester's core assertion—that negligence allegations automatically trigger a complete defense under the CGLs (Motion pp. 16-17)—collapses under the very authority it invokes: *Buss v. Superior Ct.*, 16 Cal. 4th 35, 47-48 (1997).[8] *Buss* holds that an insurer's duty to defend a "mixed" action extends ***only*** to claims that are ***potentially covered***—not to those that are not. While a primary insurer may provide a temporary "defense of the entire action" as a prophylactic measure "imposed by law" (*id.*), that does not expand the ***contractual scope*** of defense coverage.

Here, many claims asserted against RCBO—intentional infliction of emotional distress, sexual harassment, sexual battery, human trafficking, *etc.*—are not even ***potentially covered*** by the CGLs' accident-and-bodily-injury confines, yet they fall squarely within the Umbrella's broader personal injury coverage (including assault and battery not committed by or at RCBO's direction, invasion of privacy, and emotional/psychological harms). Thus, even under Westchester's mistaken construction, the Umbrella still provides primary (or "co-primary") defense coverage. *See Am. States,* 800 Fed. App'x at 454 (holding that umbrella insurer had a "co-primary" duty to defend where the underlying coverage did not encompass all claims alleged); *see also Certain Underwriters at Lloyd's London v. Columbia Cas.*

---

[8] *Buss* is also the same case Westchester purports to rely upon in seeking reimbursement for the fraction of defense costs it has paid to date. *See* Complaint (ECF No. 1), at ¶¶ 55-59.

*Co.*, Case No. 23-cv-02157-AJB-DDL, 2025 WL 1287727, at *5–7 (S.D. Cal. May 2, 2025) (holding that a primary cyber insurer plausibly alleged the umbrella had a co-primary duty to defend where the underlying lawsuit alleged damages for both violations of privacy regulations and negligent "organization, direction, and control" of medical operations—the former triggering cyber coverage, the latter triggering umbrella coverage).

**D. Westchester's Motion as respects primary umbrella coverage must be denied.**

Westchester's reading of Section II cannot survive the text, structure, or precedent that govern it. The policy language says "*any occurrence not covered*"—not "*any suit not defended*." It sequences coverage first, defense second, mirroring the rule that the duty to defend arises whenever there is a ***potential for indemnity coverage***. Every California/9th Circuit court to address this formulation—*Legacy Vulcan*, *American States*, and *NW Pipe* among them—has held that "not covered" refers to indemnity, not defense.

Even setting that aside, the CCVA Claims allege precisely the types of occurrences and injuries the Umbrella Policies were designed to reach and that the CGLs do not. The gap between the policies is plain, and under *Legacy Vulcan*, that potential gap alone triggers a duty to defend. Nor can Westchester salvage its Motion by recasting "*not covered*" as a defense concept; *American States* confirms the Umbrella's independent duty to defend when claims fall within its coverage but outside the CGLs. Section II's promise of "additional primary coverage" is triggered here, and Westchester's refusal to honor that promise is a breach. The Motion must be denied as to the primary umbrella duty to defend.

**II. Ultimate Net Loss Coverage.**

The remainder of Westchester's "Argument" section (Motion pp. 10-15) rests on an undisputed premise: the Umbrella Policies are not triggered merely because an underlying carrier (here, Centennial) became insolvent. RCBO agrees.

But Westchester stops there—ignoring a separate, independent obligation created by the Umbrella Policies themselves: Westchester's ***duty to pay RCBO's defense expenses*** as part of "ultimate net loss" once RCBO satisfies its retained limit. As explained in RCBO's Opening Brief, this indemnity obligation is distinct from—and operates entirely apart from—any express duty-to-defend provision. Because Westchester addresses this issue only obliquely in its "Background" section, RCBO clarifies the contractual framework and corrects several key misstatements.

**A. The Umbrella Policies contain three separate duty-to-defend grants.**

Westchester repeatedly conflates three distinct duty-to-defend obligations, even though they are expressly enumerated in the Umbrella Policies as such.[9] Each clause occupies its own sphere:

1. **"Insuring Agreement II (Defense Settlement)."** This is the ***primary umbrella*** defense grant, triggered when an occurrence falls within the Umbrella but outside the CGLs. RCBO's Opening Brief establishes that Westchester has breached this primary defense duty with respect to the CCVA Claims.

2. **"Insuring Agreement V (Retained Limit – Limit of Liability) with respect to the exhaustion of the aggregate limits of underlying policies listed in Schedule A."** This clause provides ***excess duty-to-defend coverage*** when the aggregate limits of the Schedule A underlying policies have been reduced or exhausted *by reason of losses paid thereunder*:

[9] *See* "**CONDITIONS ¶ E. Assistance and Cooperation,"** Policy Stip., Ex. A (Industrial Policies), at 034 (explaining that Westchester has no duty to defend except "as provided in ***[1] Insuring Agreement II (Defense Settlement)*** or in ***[2] Insuring Agreement V (Retained Limit – Limit of Liability) with respect to the exhaustion of the aggregate limits of underlying policies listed in Schedule A*** or in ***[3] Condition J (Underlying Insurance)***…").

> In the event of the reduction or exhaustion of the aggregate limits of liability of the underlying policies listed in Schedule A by reason of losses paid thereunder, this policy, subject to the above limitations, (1) in the event of reduction, shall pay the excess of the reduced underlying limits; or (2) in the event of exhaustion, shall continue in force as underlying insurance.

This duty-to-defend arises only if a Centennial policy is shown to have an aggregate limit actually exhausted through payment of losses (*see Span, Inc. v. Associated Int'l Ins. Co.*, 227 Cal. App. 3d 463, 477 (1991)).

3. **"Condition J (Underlying Insurance)."** A second ***excess duty-to-defend*** clause applies when "underlying insurance is exhausted by any occurrence":

> If underlying insurance is exhausted by any occurrence, the company shall be obligated to assume charge of the settlement or defense of any claim or proceeding against the insured resulting from the same occurrence, but only where this policy applies immediately in excess of such underlying insurance, without the intervention of excess insurance of another carrier.

Neither party contends that Condition J is triggered here. Yet Westchester's reading depends on collapsing this clause into the others—producing logical impossibility. Under its theory:

(i) RCBO must satisfy Condition J before any defense obligation arises;

(ii) defense costs paid by Centennial do ***not*** erode the per-occurrence limits of Centennial's CGLs; and

(iii) RCBO must therefore "satisf[y] the Centennial per-occurrence limit in judgments or settlements" to trigger coverage (Motion pp. 9–10).

The flaw is obvious. Only Centennial's own payments can erode its policy limits. The insured's payments — whether for defense, settlement, or indemnity — cannot "satisf[y] the Centennial per-occurrence limit." Westchester's interpretation therefore collapses under its own logic: it requires RCBO to perform an act (satisfy

Centennial's limits through the insured's ***own*** payments) that is, by definition, impossible.

### B. "Ultimate Net Loss" indemnity coverage is separate from any duty to defend.

Each of the three duty-to-defend clauses must be read independently and in harmony with the policy's broader indemnity framework. Westchester not only conflates these clauses but also folds them together with its distinct "ultimate net loss" obligation—a separate indemnity covenant triggered once RCBO meets its retained limit.

The "ultimate net loss" clause is not a duty-to-defend clause; it is an ***indemnity obligation*** that operates whether or not a contemporaneous duty to defend is active. The provisions function in separate temporal and conceptual lanes. *See Span, Inc.*, 227 Cal. App. 3d at 478 (even absent a duty to defend, excess carrier owed separate "ultimate net loss" obligation to pay amounts incurred above scheduled underlying limits).

Under the Umbrella Policies' plain terms, "ultimate net loss" coverage functions as follows:

- **Trigger:** Section I applies when the insured "sustain[s]" "ultimate net loss in excess of the retained limit."[10]
- **Retained limit:** Defined in Section V, in relevant part, as "the total of the applicable limits of the underlying policies listed in Schedule A."[11]
- **Scope:** Section III ("Definitions") ¶ 5 defines "ultimate net loss" to include not only damages paid but "all expenses … incurred by the insured in the investigation, negotiation, settlement and defense of any claim or suit."[12]

---

[10] Policy Stip., Ex. A (Industrial Policies) at 031.
[11] *Id.* at 033.
[12] *Id.* at 032.

- **Expenses paid by other insurers does not constitute "ultimate net loss":** The same paragraph says that "ultimate net loss" does not include "defense, investigation, settlement or legal expenses covered by underlying insurance"—meaning it excludes expenses ***actually paid by another insurer***, not those borne by the insured.

Taken together, these provisions compel immediate payment of RCBO's defense costs once its out-of-pocket expenses (including defense costs) exceed the retained limit. Even if no duty-to-defend clause is currently active, Westchester must indemnify RCBO for defense expenses exceeding that threshold. *See Sempra Energy v. Associated Elec. & Gas Ins. Servs., Ltd*, 772 F. Supp. 3d 1148, 1154 (C.D. Cal. 2025) (holding that language requiring indemnification of "all expenses … incurred … in the defense of any claim or suit" created an immediate duty to advance defense costs).

**C. RCBO's retained limit obligation is capped at $1.5 million—no more.**

Even if Westchester is correct that the Umbrella does not insure against Centennial's insolvency (Motion pp. 1–2), Westchester ignores that the policy expressly insures RCBO once RCBO has met its ***own*** retained-limit obligation. That limit is defined as "the total of the applicable limits of the underlying policies listed in Schedule A…."[13] By Endorsement 5, the parties fixed that figure at $1.5 million in total.[14] *See State Ins. Fund v. Int'l Ins. Co.*, 251 A.D.2d 86, 87 (N.Y. App. Div. 1998) (holding that "the total of the applicable limits…listed in Schedule A" refers to the total of the amounts specified for the category of coverage applicable to the incident, regardless of whether such listed policies actually provided coverage or the amount paid thereunder).

Reading the clause otherwise would conflate RCBO's fixed retained-limit

[13] Policy Stip, Ex. A (Industrial Policies), at 033.
[14] *Id.* at 016.

obligation with Section V's separate ***excess duty-to-defend*** clause, which applies only upon actual exhaustion of the underlying policies by the ***underlying insurers themselves***. For purposes of satisfying the retained limit, it is irrelevant whether Centennial's CGLs had aggregate caps or whether they were ever paid. *See State Ins. Fund*, 251 A.D.2d at 87 ("It does not avail defendant that plaintiff's underlying policy, listed in Schedule A as having an 'applicable limit' of $100,000, may in fact have provided unlimited coverage.").

Westchester's contrary theory—that RCBO must "pay the $500,000 per-occurrence limit under Centennial's policies in judgments or settlements…to trigger coverage under the Westchester Policies" (Motion p. 7)—is textually indefensible.

First, Section V's structure forecloses that interpretation. The retained limit is the greater of:

> (a) "the total of the applicable limits of the underlying policies listed in Schedule A"; or
>
> (b) an amount as stated in Item 4(C) of the declarations [$10,000] *as the result of any one occurrence* not covered by the said policies or insurance.

Only subpart (b) employs "per occurrence" language. Subpart (a) does not. This distinction is decisive: the "per occurrence" concept applies only to (b). Under (a), the retained limit is measured globally—by the total amount of scheduled limits—not separately per occurrence.

Second, Westchester asserts that "[a]s with all general liability policies, defense costs do not erode per-occurrence limits" under the CGLs. Motion p. 3. While that may be true for the CGLs, the Umbrella Policies expressly define "ultimate net loss" to ***include*** defense costs incurred by the insured. Westchester's reading would nullify that definition by preventing defense expenditures from ever satisfying the retained-limit threshold—contradicting the very clause that defines how the threshold is met.

Third, the CGLs and Umbrella Policies insure different "occurrences." The

CGLs cover only "bodily injury, sickness or disease … which occurs during the policy period," whereas the Umbrella extends to "occurrences happening … during the policy period" regardless of when injury manifests. *See* Motion p. 20. Under Westchester's logic, the Umbrella would not attach until RCBO had first exhausted the CGLs for bodily-injury claims—even though many Umbrella-covered losses (*e.g.*, emotional distress, invasion of privacy, or other non-bodily harms) fall entirely outside that trigger. This construction collapses the coverage layers and deprives RCBO of the broader protection it purchased.

In short, Westchester's "per-occurrence exhaustion" theory rewrites Section V, contradicts the "ultimate net loss" definition, and effectively nullifies the Umbrella's broader coverage grant. The policy's text, structure, and purpose all foreclose that result.

**D. The Umbrella Policies do not "disclaim a defense."**

Westchester's assertion that the Umbrella Policies "expressly disclaim a defense for occurrences covered by underlying insurance" (Motion p. 1) misreads both form and function. The Umbrella Policies provide three interlocking but distinct coverages:

(1) **Primary umbrella coverage** which affords a first-dollar defense for occurrences not covered by the underlying CGLs but covered by the Umbrella's broader insuring agreement;

(2) **Excess duty-to-defend coverage** which affords a defense upon exhaustion of the underlying insurers' limits; and

(3) **Ultimate net loss coverage** which applies once RCBO meets its retained limit through out-of-pocket payment of defense costs, settlements, or damages.

Within that framework, the phrase in the "ultimate net loss" definition—"**[t]his policy shall not apply to defense, investigation, settlement or legal expenses covered by underlying insurance**"—is an *accounting clarification*, not a defense exclusion. It simply prevents double-counting: expenses actually ***paid*** by underlying

insurance neither count toward the retained limit nor are reimbursable again by the Umbrella. *See U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, Case No. CV 04-0662 PHX-DGC, 2006 WL 1663437, at *5 (D. Ariz. June 12, 2006) (holding that this language avoids "possible redundancy of payments" by ensuring that the excess policy does not reimburse expenses already paid by the primary).

Westchester's contrary reading would transform a bookkeeping clause into a wholesale defense exclusion—nullifying express defense coverage promises and rewriting a coordinated primary/excess structure into a policy offering *no defense at all*. Courts do not construe insurance contracts to produce internally inconsistent or absurd results.

**E. Summary.**

Westchester's "excess-only" argument fails because it collapses distinct obligations under the Umbrella Policies: (1) **primary defense coverage** for occurrences outside the CGLs; (2) **excess duty-to-defend coverage** upon exhaustion of underlying insurers' limits; and (3) **"ultimate net loss" indemnity coverage** once RCBO's out-of-pocket costs exceed the retained limit. By conflating these grants and misreading Section V's retained-limit clause, Westchester disregards both structure and text. Once RCBO's out-of-pocket surpass the fixed retained limit ($1.5 million), Westchester's indemnity obligation attaches—regardless of Centennial's insolvency or payment status.[15]

## CONCLUSION

Westchester's Motion fails on both independent grounds presented. First, under Section II's ***primary umbrella grant***, Westchester owed RCBO a duty to defend because the CCVA Claims are at least ***potentially*** within the Umbrella's

---

[15] As set forth in RCBO's Opening Brief, RCBO met its retained limit through payments in made as part of the Confidential Settlement resolving the Prior Abuse Cases. ***Alternatively, RCBO has met its retained limit via payment of unreimbursed defense costs for the CCVA Claims***. *See* Supplemental Declaration of Brent Vincent ("Vincent Supp. Decl.") at ¶ 15.

indemnity coverage and ***outside*** the CGLs' narrow accident-and-bodily-injury confines. The policy text, structure, and precedent (including *Legacy Vulcan*, *American States*, and *NW Pipe*) foreclose Westchester's contrary reading. Second, even apart from the primary umbrella duty, Westchester owes an ***immediate excess indemnity*** obligation to pay RCBO's defense costs as "ultimate net loss," because RCBO has satisfied its $1.5 million retained limit obligation.

For these reasons, RCBO respectfully requests that the Court deny Westchester's Motion for Partial Summary Judgment in its entirety and grant such other and further relief as the Court deems just and proper, including the relief requested in RCBO's Opening Brief and cross-motion for summary judgment.

Dated: October 13, 2025

Respectfully submitted,

By: /s/ Brent W. Vincent

Brent W. Vincent (*pro hac vice*)
brent.vincent@Lathropgpm.com
LATHROP GPM LLP
155 North Wacker Drive, Suite 3800
Chicago, IL 60606
Telephone: 312.920.3300
Facsimile: 312.920.3301

Andrew B. Breidenbach (CA Bar #281586)
abreidenbach@tocounsel.com
THEODORA ORINGHER PC
535 Anton Blvd., Suite 900
Costa Mesa, CA 92626
Telephone: 714.549.6200
Facsimile: 714.549.6201

Ronald A. Valenzuela (CA Bar #210025)
ronald.valenzuela@Lathropgpm.com
LATHROP GPM LLP
2049 Century Park East, Suite 3500S
Los Angeles, California, 90067-1623
Telephone: 310.789.4600
Facsimile: 310.789.4601

Alexander T. Brown (*pro hac vice*)
alexander.brown@Lathropgpm.com
Noah H. Nash (*pro hac vice*)
noah.nash@Lathropgpm.com
Caitlin M. Albaugh (*pro hac vice*)
caitlin.albaugh@Lathropgpm.com
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108
Telephone: 816.292.2000
Facsimile: 816.292.2001

Attorneys for Defendant/Counterclaim Plaintiff The Roman Catholic Bishop of Orange

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant/Counter-Plaintiff The Roman Catholic Bishop of Orange, certifies that this brief contains 4,853 words, which complies with the word limit of Central District of California Local Rule 11-6.1.

Dated: October 13, 2025

LATHROP GPM LLP

By: /s/ *Brent Vincent*
Brent Vincent
Attorney for The Roman Catholic Bishop of Orange